Argued and submitted January 15, 2019; convictions on Count 1 and Count 4 reversed and remanded, otherwise affirmed August 12, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

NOY KINI,
*Defendant-Appellant.*

Multnomah County Circuit Court
16CR39897; A164357

473 P3d 64

Defendant drove while intoxicated in April 2016, crashed his car, and suffered injuries that were treated at a hospital. In June 2016, defendant again drove while intoxicated. The state subsequently charged defendant with two counts of driving while under the influence of intoxicants (DUII) (one count for each of the two incidents) and two counts of reckless driving (again, one count for each of the two incidents). At trial, the court allowed the state to introduce hospital records that showed, among other things, results from a blood-ethanol test that was performed when defendant was treated after the April 2016 car crash. A jury found defendant guilty of both DUII counts and one count of reckless driving, and it found him not guilty of the other reckless-driving count. On appeal, defendant contends that the trial court violated his confrontation rights under the state and federal constitutions when it allowed the state to introduce the hospital records without showing that the declarants were unavailable. *Held*: Even assuming (without deciding) that some business records will not implicate the Article I, section 11, confrontation right, the hospital records in this case include the types of opinions, gratuitous facts, and exercises of judgment that make them "witness statements" for purposes of Article I, section 11. Accordingly, the trial court erred by admitting them in the absence of a showing of the declarants' unavailability. Moreover, that error was not harmless with respect to either Count 1 or Count 4 because there is more than a little likelihood that the error affected the jury's verdicts on those counts.

Convictions on Count 1 and Count 4 reversed and remanded; otherwise affirmed.

Leslie G. Bottomly, Judge.

Mark Kimbrell, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F.

Rosenblum, Attorney General, Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and Aoyagi, Judge, and Hadlock, Judge pro tempore.

HADLOCK, J. pro tempore.

Convictions on Count 1 and Count 4 reversed and remanded; otherwise affirmed.

**HADLOCK, J. pro tempore**

Defendant drove while intoxicated in April 2016, crashed his car, and suffered injuries that were treated at a hospital. In June 2016, defendant again drove while intoxicated. The state subsequently charged defendant with two counts of driving while under the influence of intoxicants (DUII) (one count for each of the two incidents) and two counts of reckless driving (again, one count for each of the two incidents). At trial, the court allowed the state to introduce hospital records that showed, among other things, results from a blood-ethanol test that was performed when defendant was treated after the April 2016 car crash. A jury found defendant guilty of both DUII counts and one count of reckless driving, and it found him not guilty of the other reckless-driving count. On appeal, defendant contends that the trial court violated his confrontation rights under the state and federal constitutions when it allowed the state to introduce the hospital records without showing that the declarants were unavailable. For the reasons set out below, we affirm defendant's conviction for DUII related to the June 2016 incident (Count 3), but we reverse and remand defendant's convictions for DUII related to the April 2016 incident (Count 1) and for reckless driving (Count 4).

The facts pertinent to the trial court's challenged ruling are not disputed for purposes of this appeal. We describe the underlying facts associated with defendant's criminal conduct in the light most favorable to the state, in keeping with the jury's guilty verdicts, and we review the trial court's ruling on the constitutional confrontation issues for errors of law. *State v. Hudspeth*, 292 Or App 477, 478, 424 P3d 768, *rev den*, 364 Or 207 (2018).

On April 22, 2016, defendant crashed his car in a residential neighborhood. Police officer Powell responded and observed that defendant had a large head wound, with large amounts of blood dripping down his face into the car's interior. Defendant was lethargic, a strong odor of beer was coming from his car, and multiple full and empty beer cans were inside the vehicle. Medical personnel took defendant to a hospital, where he was treated and then released.

In June 2016, police officer Chong saw defendant driving quickly and erratically, "going in and out of traffic with rapid lane changes." Chong initiated a traffic stop; when he approached defendant, Chong observed that defendant had bloodshot eyes and that defendant's breath smelled strongly of alcoholic beverages. Chong took defendant to a police station, where another officer performed a DUII investigation. Defendant consented to certain field sobriety tests, and his performance on those tests suggested that he was impaired by alcohol. An Intoxilyzer breath test indicated that defendant had a blood alcohol content (BAC) of .23 percent.

Defendant was charged with DUII and reckless driving in relation to the April 2016 incident (Counts 1 and 2); he was similarly charged with DUII and reckless driving in relation to the June 2016 incident (Counts 3 and 4).[1] Defendant moved to exclude the hospital records related to his treatment after he crashed his car in April 2016; he argued, among other things, that admitting the records would violate his confrontation rights. The trial court denied that motion and, at defendant's jury trial, it admitted the records under the OEC 803(6) "business records" exception to the rule against hearsay without requiring the state to make a showing that the declarants—the people who made the statements contained in the hospital records—were unavailable to testify.[2]

---

[1] The state initially also charged defendant with criminal mischief, but it dismissed that charge before trial.

[2] OEC 803(6) provides that these documents are not excluded by OEC 802, the general rule against hearsay, "even though the declarant is available as a witness":

"A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this subsection includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

Those hospital records—the admission of which defendant challenges on appeal—include the following pertinent information:

- Statements that defendant was admitted to (and discharged from) the hospital on April 22, 2016, that defendant had been in a car crash, and that defendant had "[a]cute alcohol intoxication," a deep forehead laceration, acute pain, and "[c]ombative behavior."

- Notes that defendant was "[c]ombative, screaming" and "[n]ot answering questions or following commands."

- Indications that hospital staff were unable to obtain information from defendant like his medical history "due to combativeness and intubation."

- Final diagnoses that include "[a]lcohol abuse with intoxication, unspecified" and "[o]ther conduct disorders."

- The notation: "ETOH at time of admission 272"

- The following note regarding an analysis of defendant's blood:

  > "Ethanol Lvl            272            mg/dL
  > Comment:
  > Not Detected: <10 mg/dL
  > Excitement: 10-50 mg/dL
  > Flushing, slowing of reflexes, impaired visual
  >    activity: 50-100 mg/dL
  > Depression of CNS: >100 mg/dL
  > Fatalities reported: >400 mg/dL"

- A form by which the hospital reported to law enforcement that defendant's blood alcohol level had tested at ".272."

Those hospital records were received into evidence. In addition, Powell read some excerpts from the records to the jury, including portions stating that defendant had been diagnosed with "acute alcohol intoxication" and that his ethanol level had been measured at 272 milligrams per deciliter. However, the trial court sustained defendant's objection

to Powell's characterization of that number as reflecting defendant's blood alcohol content and, on cross-examination, Powell acknowledged that results from Intoxilyzer breath tests are reported in a different format that does not refer to deciliters.

In its closing argument, the state initially stressed that the jury should look to the hospital records for evidence that defendant had been "super drunk" when he crashed his car in April 2016:

"[The hospital records] will show you a lab test performed for ethanol level ***. Ethanol level: 272 milligrams per deciliter. And then in the comment section of the lab result, it actually is going to give you some information about what different levels of ethanol in milligrams per deciliter can do to the human body.

"If none is detected, that would be less than 10 milligrams per deciliter. Exciting is 10 to 15 milligrams per deciliter. Flushing, slowing of reflexes, impaired visual activity: 50 to 100 milligrams per deciliter. Depression of CNS, the central nervous system, at over 100 milligrams per deciliter, and fatalities are recorded at 400 or greater milligrams per deciliter.

"We are high. [Defendant] is super drunk that day. He is—at 272 milligrams per deciliter of ethanol in his blood. That is very, very drunk."

The state also pointed to the hospital records showing that defendant had been diagnosed with "[a]cute alcohol intoxication."

At one point in its closing argument, the state said that it "probably wouldn't be able to prove [the April 2016 DUII] if [it] didn't have the medical records," given that Powell had not independently obtained an analysis of defendant's blood alcohol content. However, the state also pointed the jury to evidence related to the April 2016 incident other than the hospital records, including Powell's testimony about defendant's lethargy, the odor of alcohol coming from his car, and the beer cans in the vehicle.

In its rebuttal argument, the state acknowledged that jurors might feel that they had "no idea how milligrams

per deciliter convert to \*\*\* a point whatever percentage of alcohol by weight."[3] Accordingly, it argued that the jury should find defendant guilty of the April 2016 DUII charge even if it did not rely on "the number," given "the other corroborating evidence of impairment."

The state also relied on evidence of defendant's intoxication in April 2016 when it argued that the jury should convict him of having driven recklessly in June 2016, as charged in Count 4: "Think about what happened 60 days prior. Driving drunk—really drunk—crashes in the car, cuts his head open, goes to the hospital." After describing the legal standard for recklessness, the state again pointed to what defendant had done in April 2016: "Just 60 days ago, you were drunk. You crashed. You got hurt. You hurt people's property. You have no excuse to not be aware of that, and once again, we're here on June 29, you had consciously disregarded that risk."

The jury found defendant guilty of Counts 1, 3, and 4; it found him not guilty of Count 2 (the reckless-driving charge associated with the April 2016 incident). At the time initially set for sentencing, the trial court requested additional briefing on the question of whether its admission of the hospital records had violated defendant's confrontation rights under Article I, section 11, of the Oregon Constitution.

---

[3] BAC is commonly reported as a percentage by weight of alcohol in the blood. *See* ORS 813.010(1)(a) (one way for a person to commit DUII is if the person drives with "0.08 percent or more by weight of alcohol in the blood"); *see generally, e.g.*, *State v. Hedgpeth*, 365 Or 724, 726, 452 P3d 948 (2019) (discussing BAC in terms of whether it exceeded ".08 percent"). Measurements of milligrams of alcohol per deciliter of blood may sometimes (absent complicating factors) be translated to BAC simply by dividing by 1000. *See, e.g.*, *Llanos v. Gourd*, 555 F Supp 2d 454, 458 n 1 (SDNY 2008) ("BAC and mg/dl are alternative measures of the alcohol in a sample of blood. BAC is measured in percent, and mg/dl has units approximately 1000 times smaller."). If that calculation applied in defendant's case, the 272 milligrams per deciliter measurement would translate to a BAC of .272 percent, well over the legal limit of .08 percent. However, the record includes scant evidence supporting use of such a calculation in this case. The only document that could support such an inference is the form that the hospital submitted to law enforcement, which reported defendant's blood alcohol level as ".272" rather than as 272 milligrams per deciliter, and which reported that number in a box labeled "Blood Alcohol Level (Equal to or greater than .08%)." However, the state did not point to that form (the forty-eighth page of the hospital records) as a basis on which the jury could infer that the hospital test result meant that defendant's BAC was .272 percent.

After another hearing on the issue, the court again ruled that the records were admissible, and it entered a judgment of conviction accordingly.

On appeal, defendant asserts that "[t]he trial court erred when it admitted hearsay statements made by medical personnel in defendant's hospital records." Defendant does not challenge the trial court's ruling that the hospital records met the requirements for admissibility under the OEC 803(6) "business records" exception to the rule against hearsay. Rather, defendant argues that, by admitting those records without requiring the state to make a showing of the declarants' unavailability, the trial court impermissibly deprived defendant of his right to confront witnesses against him, as that right is guaranteed by Article I, section 11.[4]

Article I, section 11, provides that, "[i]n all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face to face[.]" Defendant acknowledges that the Supreme Court held in *State v. Copeland*, 353 Or 816, 839-41, 306 P3d 610 (2013), that the Article I, section 11, confrontation right does not apply to all hearsay statements but, rather, applies only to statements by "witnesses." He also acknowledges that *Copeland* recognized that a historic exception to the confrontation right exists for certain official records that are "confined to matters * * * recorded pursuant to an administrative duty and [that do] not include investigative or gratuitous facts or opinions," *id*. at 835, that such records do not qualify as "'witness' statements" for purposes of Article I, section 11, *id*. at 839, and that admission of such records therefore does not violate the defendant's Article I, section 11, confrontation rights. *Id*.

Defendant argues, however, that *Copeland* does not apply here, even by analogy, for several reasons. First, defendant contends that there is no historic exception to the confrontation right for *business* records that allowed their admission without either an opportunity for cross-examination or a showing of unavailability (unlike the exception for official

---

[4] Defendant also argues that the trial court violated his Sixth Amendment confrontation rights when it admitted the hospital records. Given our resolution of the Article I, section 11, question, we need not address defendant's alternative federal constitutional argument.

records discussed in *Copeland*). Second, defendant argues that, even if the confrontation right does not extend to all business records, the only records exempted are those that meet standards analogous to those announced in *Copeland* for official records, that is, those records that do not "contain[] investigatory or gratuitous facts or opinions." Third, and relatedly, defendant asserts that the hospital records at issue here include the kind of investigatory facts and opinions that render them "witness statements" to which the Article I, section 11, confrontation right attaches.

In response, the state emphasizes, citing *Copeland*, that "not all out-of-court statements are 'witness' statements within the meaning of Article I, section 11, and thus, not all out-of-court statements are subject to the unavailability requirement." The state contends that admission of "properly confined" business records does not implicate the "animating principles" of the Article I, section 11, confrontation clause, such records therefore are not "witness statements," and the records may be admitted into evidence without violating a defendant's right to confront witnesses against him. The state acknowledges that "certain statements in business records may be too gratuitous or investigative to fall within the historical exception to the confrontation rule." But the records in this case, the state asserts, "were business-record entries the hospital made for its own administrative purposes pursuant to business and legal duties and were not gratuitous or criminally investigative in nature." Accordingly, the state concludes, admission of the documents did not violate defendant's Article I, section 11, confrontation rights.

The state also argues that, so long as it was proper for the court to admit the result from defendant's blood-ethanol test, defendant's convictions should be affirmed because any error in admitting *additional* information in the hospital records was harmless. Specifically, the state contends that "the blood-alcohol-test result was overwhelming evidence of defendant's intoxication and rendered the remaining evidence cumulative and insignificant." Defendant asserts that error in admitting the hospital records was not harmless because those records—which included the diagnosis that defendant was acutely intoxicated—were "the

centerpiece of the state's case for Count 1," the April 2016 DUII, and were similarly important to Count 4, the June 2016 reckless-driving charge.

We begin our analysis by briefly addressing a conviction that defendant does not challenge on appeal: his Count 3 DUII conviction related to events that occurred in June 2016. Defendant has not argued that any error in admitting the April 2016 hospital records could have affected the jury's verdict on Count 3, and he does not seek reversal of the conviction on that count. Accordingly, we affirm defendant's Count 3 DUII conviction without further discussion.

We turn to defendant's state constitutional challenge to Counts 1 (DUII, April 2016) and 4 (reckless driving, June 2016), which is premised on his contention that the trial court erred by admitting the hospital records. In considering the extent to which the Article I, section 11, confrontation right may apply to private business records, such as those created by the hospital, we look to *Copeland*, which provides the Supreme Court's most recent discussion of the principles that give rise to that right. 353 Or at 839.

One issue in *Copeland* was whether the trial court violated the defendant's Article I, section 11, confrontation right by admitting a deputy sheriff's certificate of service of a restraining order, without requiring the state to show that the deputy was unavailable to testify. *Id*. at 818. The dispositive question, which the Supreme Court had not previously had occasion to address, was "whether certain types of documentary hearsay evidence simply do not implicate the confrontation right at all." *Id*. at 827. The court considered the confrontation right as it had existed at common law, and it concluded that two animating principles likely influenced adoption of the Article I, section 11, confrontation requirement: "(1) to prevent the government from using *ex parte* examinations of suspects and witnesses; and (2) to limit and condition the use of prior testimony in lieu of live witness testimony at trial." *Id*. at 829. The court also reiterated its earlier observation that nothing "indicate[s] that the framers of our constitution intended * * * to do away with the well-established exceptions to the confrontation rule."

*Id*. at 822 (quoting *State ex rel Gladden v. Lonergan*, 201 Or 163, 177, 269 P2d 491 (1954)).

The court next considered whether the confrontation right, so understood, applied to "official records" like the deputy sheriff's certificate of service. The court examined the historical contours of the official-records exception to the common-law confrontation right, which rested on a presumption that "public officers do their duty," indicating reliability where "an official duty exists to make an accurate statement." *Id*. at 830 (quoting John Henry Wigmore, 5 *Evidence in Trials at Common Law* § 1632, 618 (James H. Chadbourn rev 1974)). After explaining how the official-records exception to the confrontation right developed over the years, *id*. at 833-35, the court concluded that "[t]he content of official records that is admissible in the absence of confrontation is confined to matters that must be recorded pursuant to an official administrative duty and may not include investigative or gratuitous facts or opinions." *Id*. at 835. It described the following explanation of that limitation as "[o]ne of the most clearly expressed":

> "'The principle which seems fairly deducible *** is that a record of a primary fact made by a public officer in the performance of official duty is or may be made by legislation competent *prima facie* evidence as to the existence of that fact, but that records of investigations and inquiries conducted, either voluntarily or pursuant to requirement of law, by public officers concerning causes and effects and involving the exercise of judgment and discretion, expressions of opinion, and making conclusions are not admissible as evidence of public records.'"

*Id*. at 835-36 (quoting *Commonwealth v. Slavski*, 245 Mass 405, 140 NE 465, 469 (1923)).

Thus, the court distinguished between (1) matters that must be recorded pursuant to official duty and (2) "gratuitous facts," investigations, inquiries, opinions, conclusions, and other matters involving judgment or discretion. Although the former category of records may contain hearsay declarations, those declarations "are not 'witness' statements that offend a defendant's confrontation right if they are confined to matters that the officer is bound

by administrative duty to report and do not include investigative or gratuitous facts or opinions." *Id*. at 839. Limiting the Article I, section 11, confrontation right to "witness statements" "is consistent with the principles that animate the confrontation right because it forecloses the admission, in the guise of official records, of *ex parte* examinations of * * * witnesses or prior witness testimony that the right was meant to guard against." *Id*. Applying that understanding of Article I, section 11, to the facts in *Copeland*, the court concluded that the deputy sheriff's certificate of service was not a "witness statement" because the certificate was created pursuant to a statutory duty, it "was confined to an administrative matter that the deputy sheriff was bound by an official duty to report, and [it] did not contain any investigative or gratuitous facts or opinions." *Id*. at 841.[5]

Although *Copeland* does not purport to comprehensively define the terms "witness" or "witness statements" as they are used in conjunction with the Article I, section 11, confrontation right, the opinion supplies principles that guide our analysis in this case. Most significantly, *Copeland* teaches that the state confrontation right extends to all "witness statements," in comparison to the Sixth Amendment confrontation right, which covers only those "out-of-court statements that are testimonial in nature." 353 Or at 842 (discussing Sixth Amendment analysis). That difference is important. Generally speaking, a "testimonial" statement is one that is prepared with a "primary purpose" of creating an out-of-court substitute for trial testimony. *See id*.

---

[5] *Copeland* also discussed the court's earlier decision in *State v. Birchfield*, 342 Or 624, 157 P3d 216 (2007), in which it "held that the admission of a criminalist's laboratory report without either requiring the state to produce the criminalist at trial to testify or demonstrating that the criminalist was 'unavailable' violated Article I, section 11." *Copeland*, 353 Or at 820. As explained in *Copeland*, *Birchfield* focused on which party was obligated to demonstrate the criminalist's unavailability, and that opinion did not address what types of hearsay declarations implicate the confrontation right. *See id*. at 825-26 (discussing *Birchfield*). Nonetheless, *Copeland* does say that the *Birchfield* holding (that the criminalist's report should have been excluded) is consistent with the principles that animate the state confrontation clause because the criminalist's report "contained investigative facts and opinions involving suspected criminal activity." *Id*. at 826. Neither *Copeland* nor *Birchfield* explains exactly what constituted those "investigative facts and opinions," however, so we find *Birchfield* of little help in analyzing whether the hospital records in this case implicated defendant's Article I, section 11, confrontation rights.

at 843-46 (discussing the United States Supreme Court's recent explorations of what it means for a statement to be testimonial). *Copeland* does not describe "witness statements" in similar purpose-based terms. Instead, it focuses on the *content* of the out-of-court statements, considering whether those statements merely reflect a declarant's duty-driven recordation of nongratuitous facts and also referring to whether the statements have adequate indicia of reliability, as discussed in *State v. Campbell*, 299 Or 633, 705 P2d 694 (1985).[6] Certainly, the state and federal tests overlap to some extent—a declarant's purpose for making a statement may relate to whether, under *Copeland*, that statement simply reflects the declarant's obligation to record a fact—but the fundamental focuses of the two tests differ.

Accordingly, we focus on the content of the hospital records (not solely on the purpose for which the records were made) in determining whether their admission violated Article I, section 11. As explained below, however, our analysis here is limited. A thorough analysis of the confrontation issue presented in this case could involve answering several foundational questions that Oregon appellate courts have not previously addressed: For a hearsay declaration to fall outside the meaning of "witness statement," is it enough that the declaration does not implicate the "animating principles" of Article I, section 11, as those are described in *Copeland*, or must the declaration also be the type of statement that would have fallen within an established historic exception to the confrontation right at the time the framers adopted Article I, section 11? If the latter, was there a well-established historic exception for business records that did

---

[6] In *Campbell*, the Supreme Court adopted the confrontation test that had been set out in *Ohio v. Roberts*, 448 US 56, 100 S Ct 2531, 65 L Ed 2d 597 (1980), allowing admission of out-of-court statements if the declarant was unavailable and the statements had "adequate indicia of reliability." *See Copeland*, 353 Or at 823-25 (discussing *Campbell*). Although the United States Supreme Court later overruled *Ohio v. Roberts* in *Crawford v. Washington*, 541 US 36, 124 S Ct 1354, 158 L Ed 2d 177 (2004), shifting its focus to whether out-of-court statements are "testimonial," Oregon adheres to the test initially set out in *Ohio v. Roberts* and adopted in *Campbell*. *State v. Harris*, 362 Or 55, 64, 404 P3d 926 (2017). Notably, the United States Supreme Court recognized in *Crawford* that the *Roberts* "adequate indicia of reliability" test would allow admission of some statements that would be excluded if the focus were on whether those statements were testimonial, *i.e.*, "consist[ed] of *ex parte* testimony." 541 US at 60.

not require a showing of the declarant's unavailability? How does the *Campbell* "adequate indicia of reliability" requirement fit into that analysis? At the end of the day, do *any* private business records fall outside the category of "witness statements" to which the confrontation right attaches?

We need not, and do not, decide any of those nuanced questions here. For the reasons that follow, we conclude that—even assuming (without deciding) that some business records will not implicate the Article I, section 11, confrontation right—the hospital records in this case include the type of opinions, gratuitous facts, and exercises of judgment that make them "witness statements" for purposes of that constitutional provision.

Our first step in reaching that conclusion is to consider what contours a business-records exception to the state confrontation right would have, assuming that one exists. *Copeland* teaches that any exceptions to the confrontation right must—at least—be consistent with the principles that animated the framers' adoption of Article I, section 11: "(1) to prevent the government from using *ex parte* examinations of suspects and witnesses; and (2) to limit and condition the use of prior testimony in lieu of live witness testimony at trial." 353 Or at 829. Thus, Article I, section 11, gives defendants a constitutional right of confrontation with respect to statements made by "witnesses." And—in the context of the official-records exception—a "witness statement" is any declaration in an official record *other than* one that merely records facts that an official is duty-bound to report and that does not include gratuitous facts, investigations, inquiries, opinions, conclusions, and other matters involving judgment or discretion. *Id.* at 835-36. In other words, declarations that *do* include gratuitous facts or investigations, or matters involving judgment or discretion, are witness statements that are subject to the confrontation right, which gives the defendant an opportunity to cross-examine the declarant and which gives the jury an opportunity to observe the declarant's demeanor. *See id.* at 828 (discussing purposes served by confrontation).

Because those limitations spring directly from the principles that animate the Article I, section 11, confrontation

right, analogous constraints must exist on any business record that the state seeks to introduce in the absence of an opportunity for confrontation (again, assuming without deciding that there is an exception to the confrontation right for some business records). That is, if business records ever may be admitted without implicating a defendant's right to confront witnesses, admissibility will be limited to those records that reflect *only* facts that the declarant is duty-bound to report and that do not reflect the types of opinions, exercises of judgment, or gratuitous or investigative facts that trigger the confrontation right.

The April 2016 hospital records admitted in this case do not fit within those boundaries established by *Copeland*. The records do not merely report the result of testing defendant's blood for ethanol (272 milligrams per deciliter).[7] Rather, the records also supply the declarants' opinion and judgment, describing defendant as suffering from "[a]cute alcohol intoxication," diagnosing him with "[a]lcohol abuse," and repeatedly describing him as "[c]ombative." In addition, a comment below the reported 272 milligrams per deciliter suggests that "[d]epression of CNS" occurs at levels above 100 milligrams per deciliter." Those statements are not limited to the reporting of observable facts that the declarant was duty-bound to record. To the contrary, each of those statements is based on the declarant's assessment of the *significance* of observed facts, characterizing defendant's intoxication as "acute" and associated with "abuse," describing defendant's behavior as "combative" without identifying the particular acts that led the declarant to attach that label to him, and perhaps suggesting to the jury that defendant's central-nervous-system functioning would have been depressed, given the level of ethanol in his blood.[8] Accordingly, the records include "witness statements" for purposes of Article I, section 11, and the trial court erred by

---

[7] As noted later in this opinion, *see* 305 Or App at 849, we need not and do not decide in this case whether a bare laboratory test result, without more, is a "witness statement" for purposes of the Article I, section 10, confrontation right. The point here is that the hospital records include far more than just such a test result.

[8] In closing argument, the prosecutor equated "CNS" to "the central nervous system" without objection from defendant.

admitting them in the absence of a showing of the declar-
ants' unavailability.[9]

    We turn to the state's harmless-error argument,
which has two parts. First, the state asserts that, even if
other information in the hospital records counted as wit-
ness statements, the bare reporting of defendant's "blood-
alcohol-test result" was not a witness statement and that
result was, therefore, correctly admitted into evidence.
Second, the state calls that test result "overwhelming evi-
dence of defendant's intoxication" that "rendered the remain-
ing evidence cumulative and insignificant."

    Under the Oregon Constitution, "error is harmless
if there is little likelihood that the error affected the ver-
dict or substantially affected the defendant's rights." *State
v. Garcia*, 284 Or App 357, 363, 392 P3d 815, *rev den*, 361
Or 645 (2017). Here, there is more than a little likelihood
that the error in admitting the April 2016 hospital records
affected the jury's verdicts on Counts 1 (April 2016 DUII)
and 4 (June 2016 reckless driving, which was premised on
defendant having been intoxicated when he crashed his car
in April). Preliminarily, we note that, absent *all* of the hos-
pital records (including the blood-test result), the evidence of
defendant's intoxication in April 2016 was not "overwhelm-
ing." When officer Powell responded to the crash, he saw
that defendant had a large head wound and was lethargic.
Powell also saw beer cans in defendant's car and testified
that a strong odor of alcohol was coming from defendant's
car, but no evidence in the record suggests that he associ-
ated the odor with defendant's person. Absent the hospital
records, the jury might have had reasonable doubt about
whether defendant's lethargy was a result of intoxication
(as opposed to his significant head injury) and whether the
odor of alcohol meant that defendant had been drinking (as
opposed to indicating that beer might have spilled in the car
when it crashed). Indeed, the state acknowledged during its
closing argument that it probably could not prove its case

_____

    [9] We emphasize that our discussion relates only to defendant's confrontation
rights under Article I, section 11. This case presents no reason for us to comment
on the scope of the OEC 803(6) business-records exception to the rule against
hearsay, and nothing in this opinion should be construed as commenting on the
scope of that statutory provision.

without the hospital records, and, on appeal, the state does not rely on Powell's on-scene observations in making its harmless-error argument.

Moreover, we are not persuaded by the harmless-error argument that the state does make. Again, the state contends that any error in admitting the hospital records *other than* the bare blood-test result was harmless because that test result was properly admitted and constituted overwhelming evidence of defendant's guilt, rendering the other records "cumulative and insignificant." Even assuming (without deciding) that a bare blood-test result disassociated from any opinion or judgment could be admitted without violating a defendant's confrontation rights, the only test result included in these hospital records is a measurement of the ethanol in defendant's blood at 272 milligrams per deciliter. As the state implicitly acknowledged at trial, the record includes no meaningful evidence about how that measurement translates into the kind of BAC percentage with which jurors may be more familiar. Indeed, the trial court prohibited Powell from testifying that the test result indicated defendant's BAC. Thus, although the jury might reasonably find that the test result showed the presence of *some* amount of alcohol in defendant's blood, it could infer that the result indicated *significant* intoxication only if it considered additional information in the record, such as the comment identifying some effects of different blood-ethanol levels, the characterization of defendant as acutely intoxicated and suffering from alcohol abuse, or the description of defendant's behavior as combative, which the jury might have viewed as a sign of intoxication. Indeed, the state's closing argument expressly asked the jury to consider some of those other aspects of the hospital records, including the diagnosis of acute alcohol intoxication and the comment associated with the test result, which the state asserted could "give [the jury] some information about what different levels of ethanol in milligrams per deciliter can do to the human body." Finally, the state relied on that evidence not only to prove the April 2016 DUII charge, but in characterizing defendant as having been "really drunk" when he crashed his car in April, thus establishing that he acted recklessly when he drove drunk again in June. On that

record, admission of the hospital records was not harmless with respect to either Count 1 or Count 4.

Convictions on Count 1 and Count 4 reversed and remanded; otherwise affirmed.