No. 659 September 18, 2024 91

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JUSTIN CHARLES BRITT,
*Defendant-Appellant.*

Josephine County Circuit Court
21CR25468; A178589

Brandon S. Thueson, Judge.

Submitted March 8, 2024.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Stephanie Hortsch, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Colm Moore, Assistant Attorney General, filed the brief for respondent.

Before Shorr, Presiding Judge, Mooney, Judge, and Pagán, Judge.

MOONEY, J.

Affirmed.

**MOONEY, J.**

A jury found defendant guilty of second-degree assault, ORS 163.175,[1] following a physical altercation with his neighbor, K, during which defendant kicked K repeatedly in his side and head. Defendant appeals the resulting judgment of conviction, raising three assignments of error. In his first assignment, defendant contends that the trial court erred by allowing a nurse practitioner to testify "to [the] observations and conclusions made by [the] radiologist," whose report is in the victim's medical records. Defendant's second assignment challenges the trial court's decision to admit those medical records into evidence. He argues that the findings and impressions in the radiology report are out-of-court statements of the radiologist that do not qualify as business records under OEC 803(6) and, therefore, should have been excluded as hearsay under OEC 802. In the alternative, defendant argues that the admission of those records violated his confrontation rights under Article I, section 11, of the Oregon Constitution. In the third assignment, defendant contends the trial court erred by denying his motion for judgment of acquittal (MJOA), arguing that the evidence was legally insufficient to establish "serious physical injury" under ORS 163.175. Finally, in a supplemental assignment, defendant contends that the trial court lacked jurisdiction to enter a judgment against him because he was held in custody for more than 180 days pending trial. We affirm.

## I.   THE FACTS

Defendant knocked K to the ground during a physical altercation. He then repeatedly kicked K in his head and upper body. Five days later, K sought medical treatment at the Three Rivers Medical Center Emergency Department for his injuries and ongoing pain. K was seen in the emergency department by the Nurse Practitioner (NP) on duty who spoke with K, examined him, and obtained various studies, including computed tomography (CT) scans of the head

---

[1] ORS 163.175 provides, in part:

"(1) A person commits the crime of assault in the second degree if the person:

"(a) Intentionally or knowingly causes serious physical injury to another[.]"

and chest. The radiology report of the chest CT reflected "minimally displaced \*\*\* rib fractures." The report of the head CT contained a number of findings, including a "mild hyperdense thickening of the left tentorium compared to the right," and the radiologist's impression that a "[t]hin subdural hemorrhage [could not] be excluded." The attending NP reviewed the CT images himself and he also read the radiology reports concerning those images. He diagnosed K with rib fractures and a "subdural hematoma."

The state called the NP as a witness in its case-in-chief. The NP testified that he has both a bachelor's degree and a master's degree in nursing, that he completed a lengthy clinical rotation in the emergency department setting as part of his additional training to become a nurse practitioner, and that he is board certified in emergency medicine. The NP also testified that he is trained to read CT studies, that he conducted a "wet read[ ]" of K's CT scans, and that he also reviewed the radiologist's report of those scans. The CT scans revealed rib fractures and "evidence of [a subdural hematoma]."

The state also called K, who testified that he experienced pain in his ribs for seven to eight months and that, when he laid on his side, he could feel them "grinding." K also testified that he had headaches for three to four months following the altercation.

## II.   ADMISSIBILITY OF THE MEDICAL REPORTS

### A.   *Preservation*

We reject the state's contention that defendant failed to preserve his evidentiary arguments for appeal. In the proceedings below, defendant objected to the admission of the medical records and to the NP's testimony about certain findings contained within the medical records, arguing that the findings reflected in the radiology reports constitute hearsay outside the scope of the business records exception, that those findings relate to the "biggest issue" in the case, and that defendant would like to cross-examine the radiologist who created those reports. Those objections were sufficiently specific to alert the trial court and the state to defendant's arguments and to preserve them for appeal. *See Peeples v. Lampert*, 345 Or 209, 219-20, 191 P3d 637

(2008) (explaining that preservation "gives a trial court the chance to consider and rule on a contention" and permits "the opposing party to respond to a contention"); *see also State v. Harris*, 322 Or App 483, 489, 520 P3d 897 (2022) (holding that the defendant's generic confrontation objection preserved his argument for appeal because the objection emphasized the witness's absence and the resulting inability to cross-examine that witness, thereby triggering the state's burden to show unavailability).

B.  *The Nurse Practitioner's Testimony*

We understand the focus of defendant's challenge to the NP's testimony to be on the applicability of the business records exception to the radiology reports and on the constitutional question raised under Article 1, section 11, of the Oregon Constitution. We nevertheless begin by noting, generally, that "[n]urse practitioners are licensed to provide primary health care and are, by rule, 'independently responsible' for health services" that they provide. *Cook v. Workers' Compensation Department*, 306 Or 134, 144, 758 P2d 854 (1988). There is no dispute that the NP was the medical provider who attended to K when he presented to the emergency department. He was called as a witness to testify about his medical encounter with K, and in that context, he testified as a medical expert under OEC 702,[2] and he was permitted—and could be compelled—to testify to the facts and data underlying his medical opinion even if those facts and data were not otherwise admissible. *See* OEC 703[3] and 705[4]. The NP was, in fact, cross-examined about the

_____

[2] OEC 702 provides:

"If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

[3] OEC 703 provides:

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."

[4] OEC 705 provides:

"An expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the

data and information underlying his evaluation of K, as well as the role that the radiology reports played in his evaluation and diagnostic process.

Defendant's first assignment concerning the NP's testimony is, as a practical matter, closely intertwined with his second assignment concerning the admissibility of the medical records. We, therefore, turn to that now.

C.   *The Medical Records*

We review the question whether a record falls within the business records exception to the hearsay exclusionary rule for legal error. OEC 803(6); *Arrowood Indemnity Co. v. Fasching*, 369 Or 214, 250-51, 503 P3d 1233 (2022). We are bound by the trial court's factual findings that underlie the application of OEC 803(6), so long as those findings are supported by any evidence in the record. *Arrowood*, 369 Or at 250 (citing *State v. Cunningham*, 337 Or 528, 538, 99 P3d 271 (2004), *cert den*, 544 US 931 (2005)).

OEC 803(6) excepts business records from exclusion as hearsay under OEC 802. OEC 803 provides, as relevant:

> "The following are not excluded by [OEC 802], even though the declarant is available as a witness:
>
> "* * * * *
>
> "(6) A * * * report [or] record * * * of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the * * * report [or] record * * * all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate lack of trustworthiness. The term 'business' as used in this subsection includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

That rule expressly includes records containing diagnoses and opinions reliably made in the ordinary course of

court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

business, contemporaneously with, or shortly after, the matters that are recorded. In other words, medical records created and maintained through routine, reliable, and contemporaneous business practices are included within the scope of OEC 803(6).

Defendant relies on the Legislative Commentary to OEC 803(6), which refers to the pre-evidence code opinion, *Streight v. Conroy*, 279 Or 289, 566 P2d 1198 (1977), to argue that the medical records here are beyond the scope of OEC 803(6). The commentary cautions that the legislature did not intend "automatically to allow into evidence all business records containing opinions or diagnoses," and it instructs that the admission of hospital records "should be read in light of" *Streight*. Legislative Commentary to OEC 803(6), *reprinted in* Laird C. Kirkpatrick, *Oregon Evidence* § 803.06[2], 821 (7th ed 2020). In *Streight*, the court held that a doctor could not read verbatim another doctor's report describing the results of a controversial procedure into evidence if the doctor who performed the procedure was not available for cross-examination. 279 Or at 294-95. We read *Streight*, and the legislative commentary, to support the trial court's admission of the medical records here because the records consist of "ordinary diagnostic findings customarily based on objective data" rather than "diagnostic opinions which on their face are speculative." 279 Or at 295 (internal quotation marks omitted); *see also* Laird C. Kirkpatrick, *Oregon Evidence* § 803.06[2]-[3], 821, 826 (7th ed 2020) ("Routine opinions formed in the course of professional activity, *e.g.*, 'Plaintiff has a broken leg,' are likely to be admitted. However, more speculative, controversial, or complicated opinions, particularly when they directly relate to a central, contested issue in the case, *e.g.*, 'Plaintiff is permanently and totally disabled,' are more likely to be excluded.").

The specific records in question are the radiology reports which include the radiologist's findings and impressions of the head and chest CT scans. No one contends that CT scans are controversial. The radiologist's findings included "mild hyperdense thickening of the left tentorium compared to the right," that a "[t]hin subdural hemorrhage

cannot be excluded," and "minimally displaced left ninth and 10th lateral rib fractures." There is no suggestion that those findings are anything other than routine, based on scans performed using common imaging equipment. Indeed, the radiologist's report is self-limiting. By noting that he could not exclude a subdural hemorrhage, the radiologist avoided speculating about the presence or absence of such a hemorrhage. The trial court did not err in admitting the victim's medical records, including the radiology report.

D.   *Defendant's Right to "Meet the Witnesses Face to Face"*

We address only briefly defendant's alternative argument asserting that the admission of the hospital records violated his confrontation rights under the Oregon Constitution. Whether he was denied his constitutional right to "meet the witnesses face to face" is a question of law. Or Const, Art I, § 11; *State v. Rockafellor*, 326 Or App 753, 757, 533 P3d 808 (2023). Defendant cites to *State v. Campbell*, 299 Or 633, 705 P2d 694 (1985), and argues, essentially, that even if the medical records were admissible as business records under OEC 803(6), the admission of those records violated his state constitutional right to confront witnesses in the absence of evidence establishing the unavailability of the radiologist. *Campbell*, a child sex abuse case, was decided by a divided court. It concerned, among other things, the admissibility of a three-year-old child victim's out-of-court statements under OEC 803(18)(a) as that code provision existed in 1985, concluding that "the witness must be produced and declared incompetent by the court to satisfy *** Article I, section 11[.]" *Campbell*, 299 Or at 652. Defendant reads *Campbell* too broadly. *See State v. Copeland*, 353 Or 816, 826-27, 306 P3d 610 (2013) (noting that the court in *Campbell* did not address whether "certain types of documentary hearsay evidence simply do not implicate the [state] confrontation right at all").

In *Copeland*, the Supreme Court concluded that certain hearsay statements contained in public records were not "witness statements" within the meaning of Article I, section 11: "Although official records may contain hearsay declarations, such declarations are not 'witness' statements that offend a defendant's confrontation right if they are

confined to matters that the officer is bound by administrative duty to report and do not include investigative or gratuitous facts or opinions." *Id.* at 839. However, neither we nor the Supreme Court have addressed the question of whether "private business records" such as the hospital records in question here "fall outside the category of 'witness statements' to which the [state] confrontation right attaches[.]" *State v. Kini*, 305 Or App 833, 846, 473 P3d 64 (2020).

We concluded in *Kini* that admission of the medical records at issue there did, in fact, violate the defendant's confrontation rights because those records did not simply report the result of a blood test, they also contained "the declarants' opinion and judgment" describing the defendant as intoxicated, opining that the level of intoxication was "acute," diagnosing him with "alcohol abuse," and "repeatedly describing him as 'combative.'" *Id.* at 847 (brackets omitted). But we expressly limited our constitutional analysis to the records and facts of that case. *Id.* at 846. As *Copeland* and *Kini* demonstrate, not all out-of-court statements constitute "witness statements" for purposes of Article I, section 11. On appeal, defendant has not engaged with the case law and the trial court's ruling, and we will not develop an argument for him. *See Harris*, 322 Or App at 490 (declining to develop an argument on the state's behalf regarding the witness's unavailability); *see also R. S. R. v. Dept. of Human Services*, 319 Or App 149, 161, 510 P3d 209 (2022) ("It is insufficient for [the] plaintiff to merely identify [the relevant] authorities and task us with determining how, under controlling case law, they apply to his case."). We, therefore, reject defendant's first and second assignments of error.

### III.   DEFENDANT'S MJOA

In his third assignment, defendant challenges the trial court's denial of his MJOA, arguing that the evidence was insufficient to show beyond a reasonable doubt that K suffered serious physical injury. The trial court is to grant an MJOA if "the evidence * * * is such as would not support a verdict against the defendant." ORS 136.445. Where, as here, the court denied the MJOA, we view the evidence on appeal in the light most favorable to the state, and if it is sufficient to support a verdict against defendant, then we

must affirm the trial court. *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998).

A person commits second-degree assault if they "[i]ntentionally or knowingly cause[] serious physical injury to another[.]" ORS 163.175. "'Serious physical injury' means a physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." ORS 161.015(8). The state argued that the subdural hematoma created a substantial risk of death[5] and that the rib fractures caused a protracted impairment of health.

We have previously held that a concussion may cause a "protracted impairment of health" sufficient to establish "serious physical injury" in the context of second-degree assault. *State v. Stone*, 326 Or App 200, 209-10, 532 P3d 90, *adh'd to as modified on recons*, 328 Or App 203, 536 P3d 1094 (2023). In *Stone*, however, we held that the evidence was insufficient to establish a protracted impairment of health where the victim suffered some concussive symptoms "for up to three months," but there was minimal evidence as to the frequency or severity of those symptoms. *Id.* at 211-12. However, we distinguished the victim's symptoms, which included confusion and a "lack of cognizance," from pain caused by physical injuries. *Id.* at 209; *see also State v. Dillon*, 24 Or App 695, 698-99, 546 P2d 1090 (1976) (holding that the evidence was insufficient to show protracted impairment of health where the victim denied experiencing any pain caused by a bullet fragment and where the doctor testified only that the fragment could possibly affect the victim's nerves). As to whether an impairment of health is "protracted," we have concluded that disfigurement that lasts more than five months is protracted and therefore qualifies as serious physical injury. *State v. Alvarez*, 240 Or App 167, 171, 246 P3d 26 (2010), *rev den*, 350 Or 408 (2011) (concluding that a scar visible five months after the injury qualifies as "protracted disfigurement" under ORS 161.015(8)); *see*

---

[5] Because we conclude that the trial court did not err in denying defendant's MJOA based on the sufficiency of the evidence to establish a protracted impairment of health, we, like the trial court, need not and do not address whether the evidence establishes that the assault created a substantial risk of death.

*also State v. Kinsey*, 293 Or App 208, 214, 426 P3d 674 (2018) (concluding that the victim's disfigurement was "protracted" where the victim's scar was visible more than six months after assault occurred).

Here, the trial court denied the MJOA because a rational jury could decide that K suffered protracted impairment of his health as a result of the assault. The trial court walked through the testimony as it explained its ruling from the bench. It noted that there was medical testimony "that ribs can take up to three months to heal" and "that post-concussive syndrome could explain [the] headaches that [K] complained of for up to four months and that ribs do take a while to heal." The court noted that K testified "about headaches for four months" and "rib pain that impacted even the way he sleeps for seven or eight months."

The trial court did not err in denying the MJOA because a rational factfinder could conclude on this record that K suffered a protracted impairment of his health. Unlike the victim in *Stone*, who had only vague concussive symptoms for approximately three months, the evidence here is that K continued to have serious symptoms for over half a year and, specifically, experienced pain that impacted his ability to lay on his side. Based on that evidence, a rational jury could certainly conclude that K's injuries impaired his health and lasted for a protracted period of time. We therefore conclude that the evidence concerning K's injuries and the length of time he continued to experience symptoms related to those injuries was sufficient to establish the "serious physical injury" element of second-degree assault.

## IV.   SUPPLEMENTAL ASSIGNMENT - JURISDICTION

Finally, in a supplemental assignment of error, defendant challenges his conviction arguing that the trial court was without jurisdiction over him because he was held in custody for more than 180 days pending trial in violation of ORS 136.295(4)(a).[6] We have previously held that the statutory limits on pretrial custody provide criminal defendants

---

[6] ORS 136.295(4)(a) provides, in relevant part, that the court may "order an extension of custody and postponement of the date of trial" but that "in no event shall the defendant be held in custody before trial for more than a total of 180 days."

a means to obtain pretrial release but do not otherwise entitle a defendant to dismissal if they are held beyond those limits. *State v. Chelemedos*, 286 Or App 77, 82, 398 P3d 415, *rev den*, 362 Or 208 (2017). Defendant has not shown a connection between the time he spent in jail and his claim that it caused him stress and anxiety, which, in turn, actually prejudiced him by negatively impacting his ability to retain counsel and maintain an effective attorney-client relationship. *See Chelemedos*, 398 Or App at 82 (holding that the defendant "has not shown that his anxiety caused actual prejudice that would warrant dismissal of the charges"). The trial court was not deprived of jurisdiction, and it did not err by entering judgment against defendant.

Affirmed.