Argued and submitted March 11, 2021; decision of Court of Appeals and circuit court's judgment of conviction affirmed March 3, 2022

STATE OF OREGON,
*Respondent on Review,*

*v.*

MATTHEW LEE OWEN,
*Petitioner on Review.*

(CC 17CR67031) (CA A168290) (SC S067658)

505 P3d 953

Defendant was charged with two counts of second-degree assault, ORS 163.175(1)(b). He requested that the jury be instructed that, to convict him, it must find that he knew or believed his actions would result in serious physical injury or, alternatively, must find that he was criminally negligent with respect to the result of his conduct, serious physical injury to the victim. The trial court refused to give defendant's proffered instructions, instead instructing the jury, in accordance with *State v. Barnes*, 329 Or 327, 986 P2d 1160 (1999), that it need find only that defendant was aware of the assaultive nature of his conduct to convict. The Court of Appeals affirmed without opinion. *Held*: (1) The second-degree assault statute consists of two elements, a "conduct" element and a "result" element, as announced in *Barnes*; (2) abrogating one of the holdings in *Barnes*, a culpable mental state attaches to the result element, because it is a material element of the offense that necessarily requires a mental state; (3) at minimum, the culpable mental state that attaches to the result element is not "knowingly," but rather "criminal negligence"; and (4) because, in the circumstances of this case, the jury found that defendant knew that the weapons he used "would be readily capable of causing serious physical injury in the manner in which [they were] used," the instructional error was harmless.

The decision of the Court of Appeals and the circuit court's judgment of conviction are affirmed.

On review from the Court of Appeals.*

Zachary Lovett Mazer, Deputy Public Defender, Office of Public Defense Services, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender.

Michael A. Casper, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

_____

* Appeal from Multnomah County Circuit Court, Leslie M. Roberts, Judge. 302 Or App 176, 460 P3d 135 (2020).

Before Walters, Chief Justice, and Balmer, Flynn, Duncan, Nelson, and Garrett, Justices, and Nakamoto, Senior Judge, Justice pro tempore.**

NAKAMOTO, S. J.

The decision of the Court of Appeals and the circuit court's judgment of conviction are affirmed.

_____

** DeHoog, J., did not participate in the consideration or decision of this case.

**NAKAMOTO, S. J.**

At issue on review is the culpable mental state, or *mens rea*, statutorily required to prove second-degree assault, ORS 163.175. A grand jury indicted defendant on two counts of second-degree assault for knowingly causing physical injury to another person by means of a dangerous weapon. Citing *State v. Barnes*, 329 Or 327, 986 P2d 1160 (1999), the trial court instructed the jury that the state had to prove defendant's knowledge of the assaultive nature of his actions, and the court declined to give defendant's requested instructions that would have required the state to prove his mental state concerning the injuries that resulted from his actions. The Court of Appeals affirmed.

On review, defendant maintains that the trial court erroneously instructed the jury. Defendant argues that *Barnes* was incorrectly decided and that the state had to prove either (1) that he knew that his actions would cause the victim physical injury or, alternatively, (2) that he knew that his actions were assaultive *and* that, at least, he negligently caused physical injury by failing to be aware of the risk that his actions would cause such injury. We agree with defendant's alternative argument and, in part, overrule *Barnes*. However, because we conclude that the instructional error was harmless in this case, we affirm the decision of the Court of Appeals and affirm the judgment of conviction.

I.  FACTUAL RECORD AND PROCEDURAL
BACKGROUND

In a case raising whether a trial court erroneously refused to give a requested jury instruction, a reviewing court in part determines whether the record, viewed in the light most favorable to the proponent of the instruction, supported giving the instruction. *State v. Payne*, 366 Or 588, 607, 468 P3d 445 (2020). And to determine whether instructional error was harmless, a reviewing court considers in part "the context of the evidence and record at trial, including the parties' theories of the case." *State v. Ashkins*, 357 Or 642, 660, 357 P3d 490 (2015). We describe the record accordingly.

A.  *The State's Case*

Defendant was indicted on two counts of second-degree assault. The state alleged that defendant had used a dangerous weapon, his boots in the first count and the pavement in the second count, to cause physical injury to the complainant, D. The trial concerned an incident one evening in Portland in which defendant pushed D down and, according to the state, kicked and stomped on D with his boots.

D testified that, while walking through downtown, she ran into a group of friends and acquaintances, stopped to chat, and played her guitar. Defendant was sitting near the group. After D made a mistake playing a song, defendant directed a vulgar insult at her. When D approached defendant and told him not to talk to her like that, defendant suddenly grabbed D, twisted an arm behind her back, and punched her in the face. She fell to the ground. When she tried to get up, D felt defendant's boot land on her back, and the force pushed her face into the sidewalk. Defendant kicked D in the back of the head repeatedly, stomping her head down into the pavement. The next thing D remembered was that she was running away.

Two witnesses confirmed D's account of the attack. Blakeman saw defendant send D to the ground and stomp her head into the pavement three times. Jones heard a "vicious skin on skin sound"—the punch—and then looked over and saw D crawling away. He saw defendant punch D again and then stomp on the back of her head.

Portland Police Bureau Officers Matica, Hall, and Weber also testified. Matica and Hall were driving on patrol when a man flagged them down to report that a woman had been assaulted and pointed out where the man who assaulted her was. They immediately noticed D, who was upset, injured, and bleeding. While Matica called for an ambulance, Hall spotted and approached defendant and repeatedly yelled "stop, police," but defendant ran. Hall chased him on foot, and Weber, in a police car, came to assist. Eventually, they apprehended defendant in a parking lot.

The state also called a detective and a crime scene technician to testify about defendant's boots, a trial exhibit.

The boots had a hardened "comp toe" or "safety toe." The crime scene technician confirmed that stains on the boots indicated the presence of blood.

D's medical records were received in evidence, and D testified about her injuries from the assault. Her lip was partially detached, requiring repair and causing nerve damage; her nose and a tooth were broken; and she had a hairline fracture in her shoulder.

B.  *Defendant's Case*

Defendant was the sole witness in his defense. The defense theory of the case was that D, unprovoked, had initiated the incident by hitting defendant in the face. After that, he tried to protect himself by pushing D down and keeping her on the ground with his foot.

Defendant recounted that, some days before the incident at issue, Jones, the state's witness, was drunk and had shoved and hit defendant without warning. On the evening of the incident, Jones and D walked toward him. While defendant was focused on Jones, D "cold cocked" defendant on the side of his face with something in her hand, such as keys or a rock. Defendant had swelling and a bruise on his face as a result. He was "seeing stars," his knees buckled, and he fell back, when D hit him again. Defendant then pushed D away, causing D to stumble and fall. Defendant, still dizzy, thought that D was trying to get back up, so he pushed her down with his foot to keep her from hitting him again. Defendant did not stomp on or kick D.

Defendant explained that he ran because he was disoriented and wanted to get out of the situation; he was unaware that the police were chasing him until he saw the marked patrol car with overhead lights on in the parking lot. Defendant told the officers that he had been assaulted, but they ignored him and did not ask him what had happened.

C.  *The Jury Instructions*

Before trial, defendant requested eight special jury instructions. The trial court incorporated his first two requested instructions, which focused on whether defendant knew that, as used, the boots and the pavement had the

characteristics of a dangerous weapon.[1] Defendant's next two requested instructions focused on whether he knew that his actions would cause physical injury to D:

"(3) You must find that [defendant] knew or believed his actions would result in physical injury.

"(4) It is not enough, as a matter of law, that [defendant] was aware of a substantial risk that his actions would result in physical injury."

Defendant acknowledged in a supporting memorandum of law that *Barnes* did not support those instructions. But defendant argued that *State v. Simonov*, 358 Or 531, 368 P3d 11 (2016), did and that *Barnes* was no longer good law.

Finally, in case the trial court declined to give instructions (3) and (4), defendant requested an alternative set of four special instructions. Based on *Barnes*, two of the instructions focused on whether defendant knew the "assaultive nature" of his actions:

"(5) In order to find [defendant] guilty, you must find he knew of the assaultive nature of his conduct.

"(6) 'Assaultive nature of his conduct' means aggressive behavior that is more likely than not going to cause an injury."

The other two instructions rested on his contention that, in light of *Simonov*, the jury had to find that, at least, he was criminally negligent in causing physical injury to D:

"(7) In addition, in order to find [defendant] guilty, you must find that he negligently caused physical injury.

"(8) To find that he negligently caused physical injury, you must find he failed to be aware of a substantial and unjustifiable risk that []he would cause serious physical injury. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation

---

[1] Those requested instructions were as follows:

"(1) To prove assault in the second degree based on a shoe, the state must prove that [defendant] knew the shoe would likely cause serious physical injury in the manner it was used.

"(2) To prove assault in the second degree based on cement, the state must prove that [defendant] knew the cement would likely cause serious physical injury in the manner it was used."

from the standard of care that a reasonable person would observe in the situation."

Concluding that *Simonov* did not govern, the trial court declined to give any of defendant's special instructions (3) through (8). Instead, following *Barnes*, the trial court provided the jury with instructions setting forth the elements of second-degree assault and defining "knowingly" and "with knowledge" as used in the elements of the crime.

First, the trial court explained that the state had to prove three elements to establish that defendant committed second-degree assault:

"Oregon law provides that a person commits the crime of assault in the second degree if the person knowingly causes physical injury to another by use of a dangerous weapon.

"In this case, to establish assault in the second degree, the state must prove beyond a reasonable doubt the following elements:

"(1)   The act occurred on or about September 26, 2017; and

"(2)   [Defendant] caused physical injury to [D] by means of a dangerous weapon.

"(3)   [Defendant] knew the shoe (as to count 1) or the pavement (as to count 2) would be readily capable of causing serious physical injury in the manner it was used."

The court then instructed the jury as to how the knowing mental state applied to the last two elements of the offense:

"A person acts 'knowingly' or 'with knowledge' if that person acts with an awareness that his conduct is of a particular nature or that a particular circumstance exists.

"When used in the phrase, 'knowingly cause physical injury to [D],' 'knowingly' means that the defendant acted with an awareness that his conduct was assaultive in nature.

"When used in the phrase 'knew the shoe or the pavement would be readily capable of causing serious physical injury in the manner it was used,' 'knew' means that the

defendant acted with an awareness that the shoe or the pavement was readily capable of causing serious physical injury in the manner it was used.

"Knowledge is also established if a person acts intentionally."

The jury found defendant guilty of both counts, and the trial court merged the guilty verdicts before sentencing defendant. The Court of Appeals affirmed the judgment of conviction without issuing an opinion.

Defendant then petitioned for review, arguing that *Barnes* should be overruled in light of our recent cases concerning culpable mental states. We allowed review to address the culpable mental state requirements for second-degree assault, an offense frequently at issue in Oregon's trial courts.

## II. ANALYSIS

What the state must prove about the defendant's state of mind for a second-degree assault conviction ulti-mately depends on statutory construction. *See State v. Rainoldi*, 351 Or 486, 490, 268 P3d 568 (2011) (noting that the "extent to which criminal liability requires proof of a particular mental state is prescribed by statute"). To con-textualize the parties' arguments, we first review the basic framework of the statutory "culpable mental state" require-ment that relates to this case.

### A. *The Statutory Culpable Mental State Requirement*

The culpability statutes were enacted in 1971 as part of the legislature's complete revision of Oregon's crimi-nal laws. Or Laws 1971, ch 743. The Oregon Criminal Code includes provisions defining a "culpable mental state" and delineating four different mental states, ORS 161.085, and describes "when a culpable mental state must be proved, ORS 161.095, ORS 161.115, and ORS 161.105." *State v. Buttrey*, 293 Or 575, 580, 651 P2d 1075 (1982). The culpa-bility statutes were intended to provide a uniform statu-tory scheme for determining which elements of an offense require which culpable mental states. *See Buttrey*, 293 Or at 580 ("The Criminal Code sought to create a uniform

system for determining offense classifications and culpability requirements.").

1.   *General requirement for culpable mental state*

The legislature has required that, to obtain a conviction, the state must prove that the defendant "acts with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state." ORS 161.095(2). That requirement generally applies to any criminal offense defined by a statute in the Oregon Criminal Code. *See* ORS 161.105 (providing exceptions for violations or certain offenses defined outside of the Oregon Criminal Code).

Assault offenses, codified in ORS 163.160 through 163.185, are part of and defined in the Oregon Criminal Code of 1971. *See* ORS 161.005 (defining statutory provisions included in the code). Thus, the state must prove a mental state for any material element of second-degree assault, as defined in ORS 163.175(1)(b), that "necessarily requires" a culpable mental state.

2.   *Four types of mental states and three categories of elements*

Four types of culpable mental states may apply to material elements of a crime requiring a culpable mental state. In order from most to least culpable, they are intentionally, knowingly, recklessly, and criminally negligent. Those mental states are defined in ORS 161.085. And, as explained in *State v. Crosby*, 342 Or 419, 428, 154 P3d 97 (2007), by definition in ORS 161.085, each type of mental state typically relates to two of the three possible categories of material elements, namely, "a conduct, a circumstance, or a result." *Accord Simonov*, 358 Or at 538-39 (reaffirming that understanding).

The most culpable mental state, "intentionally" or "with intent," relates to "a *result* or to *conduct* described by a statute defining an offense" and "means that a person acts with a conscious objective to cause the result or to engage in the conduct so described." ORS 161.085(7) (emphasis added). "Knowingly" or "with knowledge," "when used with respect

to *conduct* or to a *circumstance* described by a statute defining an offense," means that "a person acts with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists." ORS 161.085(8) (emphasis added). "Recklessly" relates to "a *result* or to a *circumstance* described by a statute defining an offense" and means that

> "a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(9) (emphasis added). Finally, "criminal negligence" or "criminally negligent," means, "when used with respect to a *result* or to a *circumstance* described by a statute defining an offense," that

> "a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

ORS 161.085(10) (emphasis added).

Although "circumstance" and "result" are undefined, the legislature defined "conduct" to mean "an act or omission and its accompanying mental state." ORS 161.085(4). "Act" as a noun means "a bodily movement," ORS 161.085(1), and the verb "to act" means "either to perform an act or to omit to perform an act." ORS 161.085(5). Accordingly, conduct elements as a category are in part tied to bodily movements, by definition.

### 3.  *Guiding rule of construction*

In ORS 161.115, the legislature has provided direction to litigants and courts called on to construe a statute defining an offense for purposes of determining the culpable mental states that apply to material elements of that offense. Subsection (1) of ORS 161.115 provides a guiding rule when a statute defining an offense specifies a mental

state and contains multiple material elements that require a mental state:

> "If a statute defining an offense prescribes a culpable mental state but does not specify the element to which it applies, the prescribed culpable mental state applies to each material element of the offense that necessarily requires a culpable mental state."

ORS 161.115(1).

To the extent that the charged offense in this case contains multiple material elements that require a culpable mental state, that guiding rule appears applicable by its terms because the offense contains a specified mental state. Pursuant to ORS 163.175(1)(b), a person commits second-degree assault if the person "[i]*ntentionally or knowingly* causes physical injury to another by means of a deadly or dangerous weapon." (Emphasis added.)

In their arguments about how to understand the elements of second-degree assault and their corresponding culpable mental states in ORS 163.175(1)(b), the state and defendant disagree over aspects of all three features of the statutory scheme summarized above. First, the parties disagree over how many elements the offense of second-degree assault contains. Second, the parties disagree over which of those elements necessarily require proof of a culpable mental state, in part due to their different views about whether and how ORS 161.095(2) applies. And third, the parties ascribe different mental states to the elements, stemming from their differing views of how to categorize each element and whether and how the guiding rule in ORS 161.115(1) applies. The court's 1999 decision in *State v. Barnes* stands in the forefront of all those disputes.

B.   *The Elements of Second-Degree Assault*

The state contends that second-degree assault as defined in ORS 163.175(1)(b) has two elements, as the court in *Barnes* already decided: a "conduct" element requiring a culpable mental state, which that statute provides, and a second element—the resultant injury—that does not require a culpable mental state. Defendant contends that the court in *Barnes* incorrectly viewed the injury as a separate "result"

element. Instead, defendant argues, the offense contains one unitary "conduct" element with a specified culpable mental state; thus, defendant views "the injury element" as "part of the 'conduct' element of second-degree assault under ORS 163.175(1)(b)." Although we normally would analyze the text of the assault statute first, in accordance with the methodology described in *State v. Gaines*, 346 Or 160, 206 P3d 1042 (2009), in view of defendant's contention that *Barnes* is no longer good law, we first examine *Barnes*. We conclude that *Barnes* controls on this issue, and defendant has not persuaded us to abandon the conclusion in *Barnes* that second-degree assault contains two elements.

    1.   Barnes

        After striking a security guard at a festival, causing a fractured eye socket that required surgery, the defendant in *Barnes* was charged with second-degree assault under ORS 163.175(1)(a), which requires proof that the defendant intentionally or knowingly caused "serious physical injury" to another. The state alleged in the indictment that the defendant had "knowingly" caused the injury. 329 Or at 329-30.

        The defendant requested that the trial court instruct the jury that, to find him guilty of knowingly causing serious physical injury, it must find that he acted with an awareness that his behavior would cause serious physical injury, and that a person who is aware of, but who consciously disregards, a substantial and unjustifiable risk that a serious physical injury will occur acts recklessly, but not knowingly. *Id.* The trial court declined to give that instruction. It instead instructed the jury that the state had to prove that the defendant "knowingly caused serious physical injury" to the victim, while providing definitions of "knowingly" and of "serious physical injury." *Id.* at 331.

        In the defendant's appeal, the Court of Appeals explained that the "knowingly" mental state typically applies to conduct, but the court viewed second-degree assault as defining a prohibited result: serious physical injury. *State v. Barnes*, 150 Or App 128, 133-34, 945 P2d 627 (1997). The court concluded that the legislature had decided to require

proof of the defendant's knowledge of the result of his con-
duct, and so the trial court should have instructed the jury
to find the defendant guilty only if the jury found that he
"knew his act would likely cause the prohibited result."
*Id.* at 134-35.

On review, this court decided whether the trial court
had erred in its instruction concerning the requisite culpa-
ble mental state for second-degree assault, as defined in
ORS 163.175(1)(a). *Barnes*, 329 Or at 329. The defendant pro-
moted the theory adopted by the Court of Appeals: Second-
degree assault is a result-based crime that requires proof
that the defendant knew that his conduct would cause seri-
ous physical injury or that his conduct was practically cer-
tain to result in that severity of injury. *Id.* at 333. The state
focused more on the defendant's knowledge of the nature
of his conduct and less on his knowledge of its aftereffect.
In the state's view, the trial court had properly instructed
the jury: The state had to prove that the defendant knew
that his conduct was assaultive and likely to cause physical
injury and that his conduct in fact caused the victim's seri-
ous physical injury. *Id.* at 332.

To resolve the issue, this court construed ORS
163.175(1)(a), the statute defining the offense, and ORS
161.085(8) (defining the "knowingly" mental state) together,
using the methodology set out in *PGE v. Bureau of Labor
and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). The
court explained that the phrase "knowingly causes" in the
definition of second-degree assault could be read as mean-
ing either that the defendant acted with an awareness of the
result that would follow or that the defendant acted with an
awareness that his conduct was assaultive. *Barnes*, 329 Or
at 335. But when the court examined legislative history con-
cerning the statutory definition of "knowingly," it concluded
that the legislature had specifically rejected the defendant's
view that the legislature intended to include a knowledge
requirement for the potential serious consequence of his act.

The court explained that Oregon's statute defin-
ing second-degree assault was enacted as part of the 1971
Criminal Code revision and that the statutory definitions
of the four mental states, also enacted in 1971, were based

on comparable provisions of New York statutes. *Id.* at 336. The court was persuaded by the Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report (July 1970)—part of the legislative history of the 1971 Criminal Code, *Barnes*, 329 Or at 336 n 5—that the drafters of the code had "followed New York" by choosing to eliminate from the definition of the "knowingly" mental state any reference to knowledge of a potential result. 329 Or at 337. Quoting the Commentary, §§ 7-11, 10, the court explained that the definition of "knowingly"

> "'was changed by the New York reporters *to eliminate any reference to the result of the conduct and to restrict the term to awareness of the nature of one's conduct* or of the existence of specified circumstances (*e.g.*, the property is stolen, that one has no right to enter a building, *etc.*).'"

*Barnes*, 329 Or at 337 (emphasis added in *Barnes*).

The court in *Barnes* concluded that, when the drafters of the 1971 Criminal Code "enacted several 'knowingly cause' assault provisions, they specifically omitted from the definition of 'knowingly' the wording that would have prescribed a knowledge requirement for the result element of those offenses." *Id.* The court then held that, "in a prosecution for assault in the second degree, the state needs to prove only that defendant was aware of the assaultive nature of his conduct and that his conduct in fact caused the victim serious physical injury." *Id.* at 338. Thus, as the parties in this case acknowledge, the decision in *Barnes* proceeded on the premise that second-degree assault contains both a conduct element and a result element.

2. *Revisiting the two-element premise of* Barnes

Defendant now challenges aspects of the court's decision in *Barnes* by arguing that the court made missteps when construing the statute defining the second-degree assault offense at issue. Initially, defendant asserts that the court failed to give the statutory text, context, and legislative history adequate attention and thereby failed to recognize that the phrase "causes serious physical injury" in ORS 163.175(1)(a) is a unitary material element. In addition to his statutory construction arguments, defendant

relies on *Simonov* and *State v. Haltom*, 366 Or 791, 472 P3d 246 (2020), to argue that the court's understanding of how to analyze culpability provisions in offenses defined in the criminal code has significantly evolved since the 1999 *Barnes* decision; that, given those recent cases, his reading of ORS 163.175(1)(a) as containing one element is correct; and that we should overrule *Barnes*.

Defendant bears the burden of establishing that we should disavow *Barnes. See State v. Ciancanelli*, 339 Or 282, 290, 121 P3d 613 (2005) ("the party seeking to change a precedent must assume responsibility for affirmatively persuading us that we should abandon that precedent"). At the start of that endeavor, defendant faces our assumption, grounded in the principle of *stare decisis*, that "fully considered prior cases are correctly decided." *Id.*

*Stare decisis* is "a prudential doctrine that is defined by the competing needs for stability and flexibility in Oregon law." *Farmers Ins. Co. v. Mowry*, 350 Or 686, 697-98, 261 P3d 1 (2011). The court in *Mowry* observed that "[s]tability and predictability are important values in the law; individuals and institutions act in reliance on this court's decisions, and to frustrate reasonable expectations based on prior decisions creates the potential for uncertainty and unfairness." *Id.* at 698. Considering *stare decisis* and competing interests, defendant in this case must identify a deficit in the analytical process that the court employed to construe the statute in *Barnes*; show that, under a correct analytical process, the holding in *Barnes* is incorrect; and persuade us that abandoning the holding in *Barnes* is now prudent. *Ciancanelli*, 339 Or at 291; *see also Mowry*, 350 Or at 693-98 (discussing considerations that may lead the court to overrule precedent in constitutional, common law, and statutory cases).

We reject defendant's argument that the court in *Barnes* wrongly decided that second-degree assault contains two elements, that is, that "knowingly causes serious physical injury" should be understood as containing two elements—(1) "causes," or engages in an act involving physical contact with another person, which *Barnes* termed "assaultive" conduct, and (2) resultant physical injury. Neither *Simonov* nor *Haltom* requires us to abrogate that

part of the *Barnes* decision, considering that neither case was concerned with a dispute about whether a part of the offense as defined constituted one element or more than one. Nor does defendant's statutory construction argument persuade us to overrule the part of *Barnes* identifying the elements of second-degree assault.

For his textual argument, defendant contends that the plain meaning of the statutory definition of assault requires us to read "causes injury" as the prohibited conduct. In defendant's view, the legislature's use of the verb "causes"—a transitive verb that requires an object—suggests that it viewed the result—physical injury—as being "inextricably and necessarily bound up with" the defendant's action. Although the syntax of the statute defining second-degree assault allows for defendant's "unitary element" reading, we disagree that it compels his reading. "Causes" also implies a physical act by the defendant, while the specified physical injury to the victim can be viewed as the required result of that act. As the court in *Barnes* explained, the second-degree assault statute can be read as containing a conduct element that consists of the defendant's bodily movement coupled with an awareness of the nature of the act, *i.e.*, that the act was "assaultive," in addition to a separate "result" element, the physical injury. *Barnes*, 329 Or at 336 (disagreeing that "knowingly" refers to "knowledge of the result that followed from defendant's conduct"); *id.* at 337 (explaining that New York drafters applied "knowingly" to "an awareness of conduct or circumstances" but not to "awareness of a potential result").

As the court viewed it in *Barnes*, the definition of "knowingly" in ORS 161.085(8) is helpful context in understanding that the legislature likely intended that mental state, along with the intentional culpable mental state, to apply to the defendant's conduct, rather than to the resultant harm to another person, charged in second-degree assault. 329 Or at 336. As earlier noted, "intentionally" and "knowingly" are the only two mental states that are normally attached to a conduct element. *See* ORS 161.085(7)-(10) (defining the mental states). And, as the court explained in *Barnes*, the legislature in 1971 followed New York by

deciding not to attach the "knowing" mental state to results as a general rule. 329 Or at 337.

Defendant counters those points by arguing that the legislature also chose to attach mental states that normally do not apply to conduct elements in other forms of assault. *See, e.g.*, ORS 163.160(1)(c) (a person commits assault in the fourth degree if the person "[w]ith criminal negligence causes serious physical injury to another who is a vulnerable user of a public way \* \* \* by means of a motor vehicle"). Essentially, defendant argues that the definitions of the mental states are not always definitive. Defendant is correct that the legislature can choose a mental state for an element that runs counter to the types of mental states normally associated with that category of element, as in ORS 163.160(1)(c). But those exceptions expressed by the legislature do not undermine the court's decision about the second-degree assault offense at issue in *Barnes*, where the legislature attached mental states to what the court understood was a conduct element that typically would take exactly those mental states.

Defendant also contends that legislative history, specifically the commission's discussion while defining the assault offenses, supports his view that the legislature viewed second-degree assault as containing a unitary element. But even defendant acknowledges differences of opinion both during meetings of the subcommittee working on defining assault and related offenses and during the commission's meeting approving the draft of the statutes defining the assault offenses. *See generally* Tape Recording, Criminal Law Revision Commission, Subcommittee No. 2, Feb 20, 1969, Tape 63, Side 1 (consideration of assault statutes); Tape Recording, Criminal Law Revision Commission, Mar 20, 1969, Tape 66, Sides 1 & 2 (discussion of assault statutes, Preliminary Draft No. 2, at full commission hearing); Minutes, Criminal Law Revision Commission, Mar 20, 1969, 13-24 (reflecting commission's discussion and vote to approve sections of the draft addressing assault offenses). Some of the members of the subcommittee working on the assault offenses spoke in terms of an intent to cause greater injury as a basis for increasing the seriousness of

the offense, while other members viewed injury as a result separate from conduct, and the same can be said of the commission when approving the draft. We are unpersuaded that that legislative history demonstrates that the legislature intended a unitary element in the second-degree assault statute.

Finally, defendant appears to argue that the decision in *Barnes* that second-degree assault contains separate conduct and result elements is unworkable. Defendant argues that the "assaultive" conduct element identified in *Barnes* strays from the text of the statute, which does not contain the term "assaultive," and that the court thereby described a "hidden element." We recognize that the "assaultive" description appears somewhat tautological through its description of the conduct element, but that adjective is shorthand for what the court recognized was an element requiring proof of the defendant's acts—bodily movements to make physical contact with another person, such as striking, biting, kicking, scratching, shoving, and the like—coupled with the conscious objective to cause the result (injury to the complainant) or with an awareness of the nature of his acts. That combination of a bodily movement with a specified mental state is a typical, workable conduct element. In short, defendant fails to convince us that the court's premise in *Barnes* that second-degree assault contains two elements was plainly erroneous.

## C.   *Whether a Mental State Attaches to the Result Element*

Having rejected defendant's initial "unitary element" argument, we next consider his arguments that *Barnes* incorrectly decided the mental states for second-degree assault even if that offense contains two elements. The court in *Barnes* did not ascribe any culpable mental state to the result element. The issue in that case was whether the defendant was entitled to his requested instruction that, to act knowingly, he had to have acted with an awareness that his conduct would cause a serious physical injury or that it was practically certain that his conduct would cause that result. 329 Or at 329-30. The court held that the trial court correctly instructed the jury and that the "state needs to prove only that defendant was aware of the assaultive

nature of his conduct and that his conduct in fact caused the victim serious physical injury." *Id.* at 338.

Defendant contends that the court in *Barnes* should have ascribed a culpable mental state to the result element and that we should overrule *Barnes* in that respect. The state, on the other hand, contends that the result element need not have a culpable mental state and that *stare decisis* favors limiting the culpable mental state requirement to what was announced in *Barnes*. We conclude that the result element of the second-degree assault offense is a "material element of the offense that necessarily requires a culpable mental state," ORS 161.095(2), and that the court in *Barnes*—perhaps because of the nature of the arguments the parties presented—did not undertake an analysis of the culpable mental state that does attach to the result element.

    1.   *ORS 161.095(2)*

This court has consistently recognized that, under Oregon law, "criminal liability generally requires an act that is combined with a particular mental state" and that ORS 161.095(2) provides that a defendant must act "with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state." *State v. Rutley*, 343 Or 368, 373, 171 P3d 361 (2007). That principle was applied in one of the first cases concerning ORS 161.095(2) that this court decided, *State v. Blanton*, 284 Or 591, 588 P2d 28 (1979).

The offense in *Blanton* was defined in *former* ORS 167.207 (1975), *repealed by* Or Laws 1977, ch 745, § 54, which prohibited the furnishing of controlled substances and provided an enhancement of the crime for furnishing to minors:

> "(1)   A person commits the offense of criminal activity in drugs if he knowingly and unlawfully \*\*\* furnishes \*\*\* a narcotic or dangerous drug.
>
> "\*\*\*\*\*
>
> "(4)   Notwithstanding subsection (2) of this section, if the defendant is 18 years of age or over and the conviction is for furnishing a narcotic or dangerous drug to a person under 18 years of age and who is at least three years younger than the defendant, criminal activity in drugs i[s] a Class A felony."

The court in *Blanton* recognized the import of ORS 161.095(2) in determining whether the state had to prove that the defendant knew the age of the recipient. The court observed (as had the Court of Appeals) that the Criminal Law Revision Commission had explained that a culpable mental state would not be required for elements like statutes of limitation, jurisdiction, and venue or in cases of exceptions specified in ORS 161.105. 284 Or at 594-95. The court noted that the state had not offered an explanation of ORS 161.095(2) that differed from the commission's and concluded that the phrase "that necessarily requires a culpable mental state" "was not meant to qualify the requirement of knowledge of the recipient's age" under *former* ORS 167.207. 284 Or at 595 n 3. Accordingly, relying on ORS 161.115(1), the court held that "the opening requirement of ORS 167.207 that one must have acted 'knowingly' to be guilty of criminal activity in drugs" extended to the age of the recipient, a material element of the enhanced offense in subsection (4) of the statute. 284 Or at 595.

And in our recent cases, we have reiterated that ORS 161.095(2) establishes the key ground rule for determining culpability requirements under Oregon law. In *Simonov*, the court explained:

> "At the outset, we describe certain core principles that guide our analysis. 'In Oregon, criminal liability generally requires an act that is combined with a particular mental state.' *State v. Rutley*, 343 Or 368, 373, 171 P3d 361 (2007). The statute defining an offense determines its applicable mental state (or mental states), as informed by the Oregon Criminal Code general culpability provisions, ORS 161.085 to 161.115. *Id.* For crimes defined and set out in the Criminal Code—including ORS 164.135—every 'material element' of the offense ordinarily requires proof of a culpable mental state. ORS 161.095(2) ('Except as provided in ORS 161.105 [governing violations and crimes outside the Criminal Code], a person is not guilty of an offense unless the person acts with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state.'). An element is 'material' unless it relates 'solely to the statute of limitations, jurisdiction, venue' or similar matters. *State v. Blanton*, 284 Or 591, 595, 588 P2d 28 (1978). In practice, then, most

elements of offenses set out in the Criminal Code require proof of a culpable mental state."

358 Or at 537-38 (footnotes omitted, bracketed material in *Simonov*). Similarly, in *Haltom*, the court stated the "core principles" slightly differently, including the following:

"(1) the statute that defines an offense, read in the context of the Oregon Criminal Code's general culpability provisions, determines the applicable mental state or states; (2) under ORS 161.095(2), a culpable mental state is required for each element of the offense except for those relating to the statute of limitations, jurisdiction, venue, and the like; *** under the statutory definitions ***, certain mental states apply to only certain categories of elements ***; and (6) thus, any effort to determine the minimum culpable mental state for a particular material element of an offense requires an initial determination of the category—conduct, circumstance, or result—under which the material element falls."

366 Or at 797-99 (footnotes omitted). Thus, as we have understood ORS 161.095(2) and repeatedly described in our decisions, the result element in this case is a material element that necessarily requires a mental state.[2]

In this case, however, the state contends that ORS 161.095(2) does not compel the result element of second-degree assault to have a culpable mental state, because that element is not one that "necessarily requires a culpable mental state." The state notes that the subcommittee working on drafting culpability provisions in the criminal code considered a second preliminary draft of Article 2 of the revised criminal code, entitled General Principles of Criminal Liability, in March 1969 that contained the definition of "knowingly" used in the New York Revised Penal Law. As the commentary in the draft explained,

"Subsection (8), the definition of 'knowingly' has been changed to eliminate any reference to result of conduct and

---

[2] The state asserts that statements about ORS 161.095(2) in *Simonov* and *Haltom* are *dicta*. Though the parties in *Simonov* and *Haltom* did not dispute that the elements at issue were material elements that required a mental state, this court in both cases—consistently with *Blanton*—described how the guidelines in the general culpability provisions from ORS 161.085 to 161.115 operate to analyze statutes defining criminal offenses, including ORS 161.095(2).

to restrict the term to awareness of the nature of one's conduct or of the existence of specified circumstances (e.g. that property is stolen, that one has no right to enter a building, etc.)."

Preliminary Draft No. 2, Criminal Law Revision Commission, Article 2 (Feb 1969) at 2 (Preliminary Draft No. 2). The draft then quoted the New York commentary to its penal law provision:

> "Under the formulations of the Model Penal Code (§2.02 [2bii]) and the Illinois Criminal Code (§4-5 [b]), 'knowingly' is, in one phase, almost synonymous with 'intentionally' in that a person achieves a given result 'knowingly' when he is 'practically certain' that his conduct will cause that result. This distinction between 'knowingly' and 'intentionally' in that context appears highly technical or semantic, and the Revised Penal Law does not employ the word 'knowingly' in defining <u>result</u> offenses. Murder of the common law variety, for example, is committed <u>intentionally</u> or not at all."

Preliminary Draft No. 2 at 3 (emphasis in original); *see also* Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §§ 7-11, 10 (July 1970) (repeating the quotation) (Commentary). In material respects, the new definition of knowingly was incorporated into the final draft approved by the commission. *See* Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report § 7(8), 6-7 (July 1970) (Final Draft and Report). The state argues that, in light of that legislative history, the legislature appears to have understood that a culpable mental state for result elements would be superfluous, considering that people who knowingly kick someone or engage in similar acts are aware that they will cause injury, and, therefore, the legislature considered it unnecessary to require a culpable mental state for the physical injury element for purposes of ORS 161.095(2).

This case, therefore, provides us with an opportunity to examine what constitutes a "material element" that "necessarily requires a culpable mental state." We reject the state's argument, in large part based on the legislative history of ORS 161.095(2). That legislative history establishes that, following the drafters on the Oregon Criminal Law Revision Commission, the legislature decided (1) to use the

Model Penal Code (MPC) approach to culpability; (2) to use the term "material element" to refer to all facts the state is legally required to prove to beyond a reasonable doubt to convict a defendant, including facts about the statute of limitations, venue, and jurisdiction; and (3) to use the phrase "that necessarily requires a culpable mental state" in what would become ORS 161.095(2) to clarify that culpable mental states did not apply to material elements relating to when and where a crime could be prosecuted, like the statute of limitations, jurisdiction, and venue.

Section 8(2) of Article 2, the culpability provisions, in the final draft of the proposed criminal code was eventually codified as ORS 161.095(2). It provided:

> "Except as provided in Section 9 of this Act [which was codified as ORS 161.105], a person is not guilty of an offense unless he acts with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state."

Final Draft and Report § 8, 7. The drafting development of Section 8(2) establishes that it was derived from the 1962 Model Penal Code.

The first draft of the culpability provisions was authored by Professor Courtney Arthur, who argued for adopting the MPC approach to culpability. *See* Minutes, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, 2 (Dec 18, 1968) ("Professor Arthur said he would like to make a strong argument for adopting the Model Penal Code approach employed in this draft for the reason that New York had adopted it as had Michigan and Illinois, and California was in the process of doing so. It would be helpful, he said, to have the same general approach as the largest states in the country to insure a reservoir of court decisions to follow as precedent as well as to maintain uniformity."). Arthur highlighted the MPC provisions reflected in the draft. For example, he explained that the four culpable mental states from the MPC simplified the variety of mental states that were then employed in statutes defining offenses and contained understandable terminology that could be used with a jury. Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, Tape 29,

Side 1 (remarks of Professor Arthur). He also explained that the MPC approach in the draft would require the state to prove a culpable mental state with respect to "each material element" of an offense. *Id*. Arthur explained that, under the MPC approach, an element like the "statute of limitations, jurisdiction, venue" was not a "material element," and he quoted the MPC definition of "material element." *Id*. Arthur further told the subcommittee that the MPC approach requires a culpable mental state not just for each crime, but for each element of a crime, unless the legislature expressly provides otherwise, stating that, if a person is guilty of a crime "without any blameworthiness at all," then "the statute has got to say." *Id*. He discussed examples and explained that there might be one culpable mental state for "an act itself" but another for "a result." Arthur explained that the MPC approach was based on the recognition that "there are crimes that are split up into different pieces." *Id*. Therefore, drafters, lawyers, and judges "have to explore every element in connection to the conduct, the attendant circumstances, and the result of the conduct." *Id*.

Section 8(2) was based on, but is not identical to, MPC Section 2.02(1), a copy of which was considered by Subcommittee 1 at its December 1968 meeting. *See* Preliminary Draft No. 1 (Dec 1968) at 10. MPC Section 2.02(1) provides:

"Except as provided in Section 2.05 [relating to offenses punishable only by fines], a person is not guilty of an offense unless he acted purposely, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense."

Subcommittee 1 was aware that the draft of Article 2 did not contain a definition of "material element," but the members did not see a need to add a definition. The minutes of the March 4, 1969, meeting of Subcommittee 1 at which the second preliminary draft, dated February 1969, was discussed, reflect that Donald Paillette, the Project Director, told the subcommittee that he had "tried to write that out of the draft and in effect not define material elements." Minutes, Criminal Law Revision Commission, Subcommittee No. 1, Mar 4, 1969, 1 (Mar 4, 1969). He

explained to the subcommittee that the MPC "defines 'element' and 'material element' and the difference is that an element of the crime will relate to something such as venue, for example," but stated, "I'm not so sure we need to define these terms." Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Mar 4, 1969, Tape 69, Side 1 (remark by Donald Paillette); *accord* Minutes, Mar 4, 1969 at 2 ("The MPC defines element and material element, the difference being that an element of the crime would be something such as venue, but it would not be a material element.").

One member of Subcommittee 1 expressed that the meaning of material elements was commonly understood. Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Mar 4, 1969, Tape 69, Side 1 (Bruce Spaulding remarked, "We know what they mean anyway."). Paillette concurred, explaining that courts identify material elements every day when they instruct juries:

> "See, in a criminal case now, the court will instruct the jury on the material elements of the crime and the burden is on the state to prove each material element beyond a reasonable doubt. Then the court will in fact say, and in this crime of larceny, the elements are that he took and carried away the personal property of another etcetera, etcetera *** and, I don't know, it just doesn't seem that this has been a problem for the courts to distinguish what's a material element and what isn't."

*Id*. Paillette explained that "material element" was being used "in the traditional manner," and Senator Burns, who chaired the subcommittee, agreed that was appropriate. *Id*. (remarks of Chairman Sen John Burns and Donald Paillette). In other words, by using "material element" in "the traditional manner," the drafters of the culpability provisions were referring to the facts that the state is legally required to prove beyond a reasonable doubt to convict a defendant.

Although Subcommittee 1 decided not to define "material element," the MPC did, as both Arthur and Paillette had explained to Subcommittee 1. The MPC defines "element of an offense" in Section 1.13(9):

"[E]lement of an offense means (i) such conduct or (ii) such attendant circumstances or (iii) such a result of conduct as

"(a)   is included in the description of the forbidden conduct in the definition of the offense; or

"(b)   establishes the required kind of culpability; or

"(c)   negatives an excuse or justification for such conduct; or

"(d)   negatives a defense under the statute of limitations; or

"(e)   establishes jurisdiction or venue[.]"

Model Penal Code, § 1.13(9) (emphasis added). To make it clear that elements that relate solely to the statute of limitations, jurisdiction, venue, and other similar matters do not require culpable mental states, the MPC drafters created the subcategory of "material elements" in Section 1.13(10):

"'[M]aterial element of an offense' means an element that does not relate exclusively to the statute of limitations, jurisdiction, venue, or to any other matter similarly unconnected with (i) the harm or evil, incident to conduct, sought to be prevented by the law defining the offense, or (ii) the existence of a justification or excuse for such conduct[.]"

*Id.* at § 1.13(10). Thus, the MPC distinguishes between material elements, which require culpable mental states, and nonmaterial elements, which do not. Material elements in the MPC relate to whether a person has committed an offense, whereas nonmaterial elements in the MPC relate to when (within what period of time) and in what court a person can be prosecuted for committing the offense.

For the third preliminary draft of Article 2, dated March 1969, the relevant amended language in Section 2 concerning general requirements of culpability and its commentary read:

"(2)   Except as provided in subsection (3) of this section, a person is not guilty of a crime unless he acts with a culpable mental state *with respect to each material element of the crime that necessarily requires a culpable mental state.*

"* * * * *

"COMMENTARY: GENERAL REQUIREMENTS OF CULPABILITY

"\*\*\* The phrase, 'that necessarily requires a culpable mental state,' has been added to make it clear that the draft does not require scienter with respect to an element relating solely to the statute of limitations, jurisdiction, venue, etc., which may be elements of that crime but do not require a culpable mental state on the part of the actor."

General Principles of Criminal Liability, Culpability, Preliminary Draft No. 3. (Mar 1969) at 3 (Preliminary Draft No. 3) (uppercase and underscoring in original; emphasis added). On April 18, 1969, Subcommittee 1 met again and, in part, discussed the general culpability requirements in Preliminary Draft No. 3.

Chairman Burns recalled the subcommittee's prior discussion of what would become ORS 161.095(2) and explained the amendment and commentary in the third preliminary draft:

"If you'll recall, we had a discussion about a culpable mental state as it related to each material element and the discussion was—and I think Mr. Spaulding brought this question up—was that what we're really talking about is that each material element that necessarily requires a culpable mental state and that we didn't want to leave any doubt \*\*\* that it was not our intent to require culpability for an element such as venue or a statute of limitations or something such as that. So, this new language is to take care of that or at least attempt to, so that it reads that he acts with a culpable mental state with respect to each material element that necessarily requires a culpable mental state."

Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Apr 18, 1969, Tape 72, Side 1 (remarks of Chairman Burns). The minutes reflect the same statement almost verbatim. *See* Minutes, Criminal Law Revision Commission, Subcommittee No. 1, Apr 18, 1969, 4 (Minutes, Apr 18, 1969).

Soon thereafter, in response to a question, Paillette explained that a defendant "wouldn't have to have a culpable mental state with respect to an element like venue." Tape Recording, Criminal Law Revision Commission,

Subcommittee No. 1, Apr 18, 1969, Tape 72, Side 1 (remark by Donald Paillette). Chairman Burns then asked, "Are we going to have any problem in determining which mental [meaning material] elements necessitate a culpable mental state?" Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Apr 18, 1969, Tape 72, Side 1 (remark by Chairman Burns); *accord* Minutes, Criminal Law Revision Commission, Subcommittee No. 1, Apr 18, 1969, 4. Paillette replied, "I think our draft takes care of that ***." *Id*. (remark by Donald Paillette). The discussion of that provision was dropped, and the language in section 2 as a whole, including subsection (2) concerning material elements that necessarily require a culpable mental state, was later approved unanimously. Minutes, Criminal Law Revision Commission, Subcommittee No. 1, Apr 18, 1969, 5.

The fourth preliminary draft concerning section 2(2) pertaining to the general requirements of culpability did not change. Later in 1969, section 2(2) was amended to read:

> "Except as provided in subsection (3) of this Article, a person is not guilty of an offense unless he acts with a culpable mental state with respect to each material element of the offense that necessarily requires a culpable mental state."

General Principles of Criminal Liability, Culpability, Amendments to Preliminary Draft No. 4. Apr 1969, 1.

In June 1969, the Criminal Law Revision Commission met, but only 7 of its 13 members were present. Paillette presented sections 2 and 3 of the fourth preliminary draft of the General Principles of Criminal Liability. Minutes, Criminal Law Revision Commission, June 17, 1969, 40, 42. In September 1969, the full commission met, and Paillette again presented sections 2 and 3 concerning culpability. Minutes, Criminal Law Revision Commission, Sept 12, 1969, 2. The minutes reflect that Professor George Platt, commission reporter, explained to the commission that the sections "reflected the policy of the Model Penal Code to attach to the acts of citizens the requirement that there be some culpable mental state before they could be sent to jail." Minutes, Criminal Law Revision Commission,

Sept 12, 1969, 2. Chairman Burns moved the adoption of
sections 2 and 3 of the culpability draft as distributed to
the commission, and the motion carried unanimously.
*Id.* at 3.

        The commentary to the final draft of section 8(2),
which in the preliminary drafts had been numbered sec-
tion 2(2), continued to explain in similar fashion that mate-
rial elements that require a culpable mental state are those
elements of an offense other than those concerning matters
like venue:

    "Subsection (2) states that except as provided in § 9, a
    culpable mental state is required for each material element
    'that necessarily requires a culpable mental state.' The
    quoted phrase is designed to make it clear that the draft
    does not require *scienter* with respect to an element relat-
    ing solely to the statute of limitations, jurisdiction, venue
    and the like."

Commentary to Criminal Law Revision Commission
Proposed Oregon Criminal Code, Final Draft and Report
§§ 7-11, 9. The commentary goes on to explain, in the sec-
tion concerning the relationship between the culpability
provisions and existing law, that the "Commission follows
the Model Penal Code in expressing a policy adverse to use
of 'strict liability' concepts in criminal law, whenever the
offense carries a possibility of sentence of imprisonment."
*Id.* at 11. The commentary, coupled with the drafting his-
tory, is conclusive. *See State v. White*, 341 Or 624, 639 n 7,
147 P3d 313 (2006) (observing other, consistent legisla-
tive history and concluding that official commentary was
"determinative").

        It is apparent from the legislative history that
Subcommittee 1 borrowed, the commission approved, and
the Legislative Assembly ultimately enacted, through its
1971 comprehensive revision of Oregon's Criminal Code,
the MPC distinction between elements that require cul-
pable mental states and elements that do not by using the
phrase "acts with a culpable mental state with respect to
each material element of the crime that necessarily requires
a culpable mental state." That phrase clarified that culpable

mental states do not apply to elements of an offense relating to when and where a crime could be prosecuted, like the statute of limitations, jurisdiction, and venue (in the MPC vernacular, nonmaterial elements), but do apply to elements that define whether a defendant has committed an offense.

### 2. *Revisiting* Barnes

Understanding what constitutes a material element "that necessarily requires a culpable mental state," we return to defendant's argument that *Barnes* incorrectly omitted a culpable mental state for the resultant injury in second-degree assault. The resultant injury is a material element of the offense that requires a culpable mental state pursuant to ORS 161.095(2). Although the court in *Barnes* rejected the defendant's argument that the state should have to prove that he knew that he would cause the injury the victim suffered, the court did not ascribe any culpable mental state to that material element. 329 Or at 338. The court was not presented with the argument that defendant here makes and did not take account of ORS 161.095(2), important context for construing the culpable mental states that apply to elements of an offense in the criminal code. In view of what the legislature intended through ORS 161.095(2), the court's holding in *Barnes*—that with respect to the resultant injury to the victim, the state need only establish the causal connection between the defendant's conduct and that injury—was incorrect by leaving the element of resultant injury without an accompanying culpable mental state. Defendant contends that the court should correct course and disavow that holding.

The state disagrees, arguing that, inevitably, occasions will arise in which later members of the court may review the same statutory text, context, and legislative history and arrive at conclusions about the legislature's intention that differ from those reached by earlier members, but those occasions should not lead to overruling the earlier decision based on interests underlying *stare decisis*, such as reliance by the bench and bar on the earlier statutory interpretation. But, as we explained in *Mowry*, 350 Or at 698, if a party can demonstrate that we failed to arrive at the correct

result in interpreting a statutory provision, "because we were not presented with an important argument or failed to apply our usual framework for decision or adequately analyze the controlling issue, we are willing to reconsider the earlier case." That is the case here.

The state further argues that this court should adhere to the holding in *Barnes* because, since that decision, rather than revising the assault statutes to clarify that a culpable mental state attaches to the result element, the legislature has enacted new provisions defining other assault offenses using the identical phrasing at issue in *Barnes*. *See* ORS 163.185(1)(b) (providing that a person commits first-degree assault if the person "[i]ntentionally or knowingly causes serious physical injury to a child under six years of age," as added by Oregon Laws 2005, chapter 513, section 1). We have said before that the legislature "may decline to address a judicial decision for any number of reasons, none of which necessarily constitutes an endorsement of the decision's reasoning or result," *Mowry*, 350 Or at 696, and the legislative history that the state presents regarding the 2005 amendment of ORS 163.185 does not persuade us that the legislature has relied on *Barnes* to an extent that we should decline to correct the erroneous interpretation of the mental state required by the second-degree assault statute. The consequence of our failing to correct the holding in *Barnes* would be that, contrary to the legislature's intention, criminal defendants will continue to be convicted without the state bearing any burden to establish a culpable mental state for the resultant injury in assault cases, a material element that necessarily requires a culpable mental state. We therefore overrule that part of *Barnes* holding that no culpable mental state attaches to the result element of second-degree assault.

D.   *Which Mental State Attaches to the Result Element*

The final issue we decide is which culpable mental state attaches to the physical injury element of second-degree assault. Defendant takes two alternative positions, arguing that, contrary to the holding in *Barnes*, the mental

state is "knowingly" or, if not "knowingly," then "criminal negligence."

    1.   Barnes *and the "knowingly" culpable mental state*

In support of his first position, defendant relies on ORS 161.115(1), which states that, when the statute defining an offense "prescribes a culpable mental state but does not specify the element to which it applies, the prescribed culpable mental state applies to each material element of the offense that necessarily requires a culpable mental state." He concludes that the prescribed and charged mental state in this case, "knowingly," must apply to the injury element, even if the resultant injury is best understood as falling into the "result" category of elements that normally is associated with the intentional, reckless, and criminally negligent mental states.

Defendant contends that the court in *Barnes* failed to consider important legislative history concerning ORS 161.115(1). He presents legislative history to argue that the commission understood, and the legislature intended, that, when the legislature included a mental state in the substantive definition of a crime but it was unclear "whether that mental state extended through to additional elements other than the one to which it was immediately appended, that mental state must carry through" to all the elements by virtue of the guideline in ORS 161.115(1). Defendant further suggests that the guideline is determinative because it was modeled on MPC Section 202.2(4), which contained an exception that Oregon did not include in ORS 161.115(1): "unless a contrary purpose plainly appears."

Fundamentally, defendant asks us to overrule the holding in *Barnes* that the commission considered and expressed, and the legislature intended, that the knowing culpable mental state should not apply to result elements and so the state is not required to prove a knowing mental state for the physical injury to the victim in second-degree assault prosecutions. *See Barnes*, 329 Or at 337 (concluding that "it is clear that the legislature considered *and specifically rejected* the Model Penal Code definition [of 'knowingly'] on which defendant relies") (emphasis in original).

Defendant does not contend that the court's conclusion about the legislative history was incorrect. Rather, defendant offers legislative history suggesting that the reason that the legislature excluded "result" elements from the definition of "knowingly" was because knowing a result is similar to acting intentionally. He contends that applying the statutory guideline in ORS 161.115(1) to the second-degree assault statute would not contradict that reason and urges that the guideline should override the typical mental states that the legislature designated for result elements.

The state urges us to adhere to *Barnes*. It argues that the holding in *Barnes* was correct: The legislature specified that the knowing culpable mental state does not apply to a result element and, thus, ORS 161.115(1) did not require the state to prove the defendant's knowledge of the result specified in ORS 163.175(1)(a), serious physical injury. For the same reason, the state adds, it need not prove in this case defendant's knowledge of the result specified in ORS 163.175(1)(b), physical injury by means of a dangerous weapon.

Based on principles of *stare decisis*, we decline to overrule the holding in *Barnes* that the state is not required to prove a knowing culpable mental state for the physical injury element in second-degree assault prosecutions. In *Blanton*, the court applied ORS 161.115(1) and carried the knowing mental state expressed in *former* ORS 167.207(1) through to the element in *former* ORS 167.207(4) providing an enhanced offense for furnishing drugs to a person under age 18. 284 Or at 595. But in *Blanton*, the knowing mental state carried through to a circumstance element—the drug recipient's age. As noted earlier, knowledge is one of the mental states definitionally associated with circumstance elements. In this case, the definition of second-degree assault suggests that applying the guideline in ORS 161.115(1) as defendant urges would be incorrect: It would require the knowing culpable mental state to apply to a result element, which normally takes an intentional, reckless, or criminal negligence mental state under the definitions of the mental states in ORS 161.085. The court in *Barnes* could have applied ORS 161.115(1), as it had done over a decade earlier in *Blanton*, but decided that the legislature's expressed

intention not to require the state to prove a "knowingly" culpable mental state for result elements was clear and should govern the resultant injury element.

In view of those crosscurrents, we are not persuaded that the court in *Barnes* reached a plainly incorrect conclusion. As a result, we adhere to the holding in *Barnes* that the "knowingly" culpable mental state does not apply to the injury element.

2.    *The culpable mental state of criminal negligence*

Defendant's alternative position is that *some* culpable mental state must apply to the result and that, at least, the minimum culpable mental state, criminal negligence, applies. We agree.

The drafters understood that the framework they created required culpable mental states for all elements that go to the heart of the criminal conduct, unless the legislature expressly provided otherwise. Professor Arthur explained to Subcommittee 1 that Preliminary Draft No. 1 provided that, if an offense did not state which culpable mental state was required, then the act must be committed intentionally, knowingly, or recklessly, because careless acts generally are not blameworthy for purposes of criminal liability. Tape Recording, Criminal Law Revision Commission, Subcommittee No. 1, Dec 18, 1968, Tape 29, Side 1 (remarks by Professor Arthur). However, Arthur explained that criminal negligence could be the culpable mental state for an act if the statute defining the offense specifically provided for criminal negligence. *Id.*; *see also* Minutes, Criminal Law Revision Commission, Dec 18, 1968 at 2 ("If he were to be guilty on the basis of criminal negligence, the statute must specifically so provide.").

Arthur explained that the state has, and ought to have, a burden to establish a culpable mental state for material elements of a crime, including attendant circumstances, and that the draft of the culpability provisions specified that burden. Tape Recording, Criminal Law Revision Commission, Dec 18, 1968, Tape 29, Side 1. He further explained that, "for any true crime" where there is "a substantial punishment involved," the crime has to have a

blameworthy element, and the statute has to be construed to have one, even if not expressed. He asked rhetorically, "Are we going to leave judges, prosecutors, lawyers, jurors to guess which mental element the legislature meant was involved with the crime?" He counseled, "Let's say it." *Id.* He then acknowledged the correctness of the understanding voiced by one of the members of the subcommittee that, under the draft culpability provisions, if no mental state is specified, then one of the mental states still will apply.

Arthur emphasized that "you could not set up a crime where one was guilty without one of the four" mental states, "without specifically saying so." Tape Recording, Criminal Law Revision Commission, Dec 18, 1968, Tape 29, Side 1. Thus, the drafters on Subcommittee 1 understood that the decision to dispense with a culpable mental state for a particular element is a policy choice that should be made expressly. *See also* Minutes, Criminal Law Revision Commission, Dec 18, 1968 at 4 ("Under this draft, he [(Arthur)] explained, intent, knowledge or recklessness would be implicit in every crime and it was only incumbent upon the Commission to make affirmative exceptions.").

In view of our conclusion that, under ORS 161.095(2), a culpable mental state applies to the material resultant injury element of the second-degree assault offense, we look to the legislature's statutory guidance concerning the culpable mental states that apply to "result" elements in the definitions of the mental states in ORS 161.085. Under those definitions, unless there is an affirmative indication that the legislature intended a different mental state, the mental states of intentional, reckless, and criminal negligence will apply to result elements. *See* ORS 161.085(7)-(10). In this case, therefore, the state, at a minimum, must prove that a defendant was criminally negligent with respect to the injury caused by the defendant's actions.[3]

E.   *Application*

Bound by the decision in *Barnes*, the trial court in this case declined to instruct the jury that it had to find a culpable mental state for the physical injury element.

---

[3] Defendant makes no argument that the legislature intended otherwise.

Instead, the court instructed the jury in relevant part that the state had to prove that defendant knowingly "caused physical injury to [D] by means of a dangerous weapon" and that, "[w]hen used in the phrase, 'knowingly caused physical injury to [D],' knowingly means that the defendant acted with an awareness that his conduct was assaultive in nature."

Defendant requested alternative jury instructions that applied a culpable mental state of criminal negligence to the injury element. In addition to an instruction on the conduct element, defendant requested the following instructions:

> "* * * In addition, in order to find [defendant] guilty, you must find that he negligently caused physical injury.

> "* * * To find that he negligently caused serious [*sic*] physical injury, you must find that he failed to be aware of a substantial and unjustifiable risk that she [*sic*] would cause serious [*sic*] physical injury. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

Aside from what appear to be word-processing errors in several places as to the charged injury in this case and defendant's gender, defendant correctly applied the definition of criminal negligence in ORS 161.085(10) in his requested instructions.

Under *State v. McNally*, 361 Or 314, 320, 392 P3d 721 (2017), "[a] criminal defendant is entitled to have the jury instructed in accordance with his or her theory of the case if the instruction correctly states the law and there is evidence to support giving it." Defendant argues that, viewed most favorably to him, his conduct would not necessarily create a substantial and unjustifiable risk of causing injury. The state does not argue otherwise. We conclude that defendant was entitled to the requested instructions.

The state argues, however, that the error was harmless. We will affirm the judgment below if we determine that there was "little likelihood that the error affected the verdict." *State v. Davis*, 336 Or 19, 33, 77 P3d 1111 (2003). To make that determination, we consider the instructions "as a

whole and in the context of the evidence and record at trial, including the parties' theories of the case with respect to the various charges and defenses at issue." *Payne*, 366 Or at 609 (quotation and citation omitted).

The jury found that defendant was aware that his conduct was "assaultive." Because defendant was charged with using weapons in his assault of D, the jury was instructed that the state was required to prove that defendant "knew" that his boots and the pavement "would be readily capable of causing serious physical injury in the manner in which it was used." The trial court also instructed that "knew" in that context meant that "defendant acted with an awareness." The jury therefore found that defendant was aware while using his boots and the pavement against D that they were readily capable of causing her serious physical injury, and the jury heard evidence of D's significant injuries. Even if the court had given defendant's requested instruction about criminal negligence, in view of the jury's findings that defendant engaged in assaultive conduct toward D and knowingly used his boots and the ground as dangerous weapons, the jury would not have found that defendant was unaware that his actions would cause D physical injuries. Thus, the jury would have found that, at least, he was criminally negligent in failing to appreciate the risk of injury to D. Accordingly, we affirm the decision of the Court of Appeals and the trial court's judgment of conviction.

The decision of the Court of Appeals and the circuit court's judgment of conviction are affirmed.