Submitted March 17, reversed and remanded June 7, reconsideration allowed, former opinion modified and adhered to as modified September 20, 2023
(328 Or App 203)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RAYMOND BLAINE STONE,
*Defendant-Appellant.*

Lane County Circuit Court
20CR64831; A177223

532 P3d 90

Defendant was charged with first-degree assault, ORS 163.185. He was found guilty and convicted of the lesser included offense of second-degree assault, ORS 163.175(1)(a), for knowingly causing serious physical injury to another. On appeal, defendant argues that the trial court erred in denying his motion for judgment of acquittal, because there was insufficient evidence to prove "serious physical injury," which is defined in ORS 161.015(8) to mean "physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." *Held*: The trial evidence was legally insufficient to prove "serious physical injury." An emergency room doctor's concern about the possibility that swelling from the victim's cheek injury could progress to the point of interfering with his breathing was insufficient to establish a substantial risk of death, where the swelling never progressed to that point. As for protracted impairment of health, evidence that the victim had experienced concussive symptoms that he perceived to last for six weeks and that his partner perceived to last for three months, without any evidence as to their frequency or severity over time, was insufficient to establish that the victim suffered a protracted impairment of health within the meaning of ORS 161.015(8).

Reversed and remanded.

Bradley A. Cascagnette, Judge.

Ernest G. Lannet, Chief Defender, Criminal Appellate Section, and Stephanie J. Hortsch, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and E. Nani Apo, Assistant Attorney General, filed the brief for respondent.

Before Aoyagi, Presiding Judge, and Joyce, Judge, and Jacquot, Judge.

AOYAGI, P. J.

Reversed and remanded.

### AOYAGI, P. J.

Defendant was charged with first-degree assault, ORS 163.185. He was found guilty and convicted of the lesser included offense of second-degree assault, ORS 163.175(1)(a), for knowingly causing serious physical injury to another. On appeal, defendant raises two assignments of error. First, he challenges the denial of his motion for judgment of acquittal, arguing that the evidence was legally insufficient to prove "serious physical injury." Second, relying on *State v. Owen*, 369 Or 288, 505 P3d 953 (2022), he contends that it was plain error not to instruct the jury on the mental-state requirement for the physical-injury element of assault. We conclude that the court erred in denying the motion for judgment of acquittal as to second-degree assault under ORS 163.175(1)(a) and that, in the particular circumstances of this case, the appropriate remedy is to reverse defendant's conviction under ORS 163.175(1)(a) and remand for further proceedings, which may include a new trial on other lesser included offenses. Accordingly, we reverse and remand.

### FACTS

Defendant, aged 65, and G, aged 80, lived near each other in a micro-home community. They were neighbors and friends. On a November night around 9:00 p.m., defendant knocked on G's door, and they began drinking whiskey and talking. Around 11:00 p.m., defendant seemed to have a problem with something that G said, and defendant started getting agitated. Both men were quite intoxicated. It is unclear exactly what happened next but, ultimately, G was injured. A neighbor drove G to the hospital.

G was treated in the emergency room. According to the doctor who treated him—and consistent with police photos in evidence—G had "fairly substantial injuries to his face," specifically bruising and swelling around both eyes, nasal fractures and a one-inch wound on his nose, a one-inch cut over his left eye, and a larger wound on his left cheek that was very swollen. G also had swelling on the "back part of the top of his mouth," which the doctor attributed to swelling from the cheek wound, as there was no wound inside G's mouth. Upon examination, G's injuries were not life threatening. The doctor admitted him to the hospital,

however, in case the swelling in G's mouth progressed to the point of interfering with his breathing, and because the swelling around his eyes was "so significant that he actually couldn't see." The doctor also did not think that G should be discharged given the possibility of a concussion or other progressive head injury. G stayed in the hospital for six days. To the doctor's knowledge, G's condition never became life threatening.

Defendant was charged with first-degree assault, ORS 163.185(1)(a), which requires "[i]ntentionally caus[ing] serious physical injury to another by means of a deadly or dangerous weapon[.]" The trial took place 10 months after G was injured and lasted three days. Numerous witnesses testified, including G, his partner, several neighbors, police officers, forensic technicians, and the emergency room doctor. Photos of G's injuries were admitted into evidence, along with other documentary evidence. G had very little memory of what happened. In a recorded police interview played for the jury, defendant also claimed very little memory of what happened. Relying on statements that G made on the night of the incident, circumstantial evidence, and some DNA evidence, the state sought to prove that defendant had viciously attacked G with a knife. The defense theory was that defendant either did not assault G at all or, alternatively, acted in self-defense when G pulled a kitchen knife on him. The defense also sought to prove that whatever caused G's injuries, it was blunt force trauma and did not involve a weapon.

Regarding his injuries, G testified that he was treated for a concussion and facial wounds and that he also had a gouge in his left arm that was too large to stitch. (The emergency room doctor did not recall the arm wound, so she did not describe it, but G mentioned it, and there are also police photos of it.) It took about a month for the swelling in G's cheek to go down. It took about six weeks for his concussion symptoms to clear up. When asked how the concussion had made him feel, G answered, "Well, I guess lack of cognizance. It's kind of hard to describe. I was reminded that I was—I kind of quit taking care of the house and one thing and another." By the time of trial, G had a small scar on his nose bridge and a little bit of discoloration on his arm. Otherwise, everything had healed or gone away, except that

he was still in "kind of a depressed mode" where he did not take care of things like he should.

G's partner of three years, Moyer, took care of G after he was released from the hospital, including staying with him for 10 days. Moyer testified that G, who had previously been "very independent," could not take care of himself for at least a month. He could not do any lifting, shopping, cooking, or cleaning. She "helped feed him, clean his house, take care of his dog, take him to doctors' appointments, everything." G lost a lot of weight because he could not wear his dentures due to his facial injuries. His hearing aids did not work, and his glasses were broken. He needed a blood transfusion at one point. He was "really weak and just tired and out of it." According to Moyer, it took about three months for G's wounds to heal to the point that he looked "somewhat normal." G also "had concussive symptoms for three months, and then that sort of turned into depression." When asked what she meant by concussive symptoms, Moyer answered, "Confused. Quiet. * * * [J]ust out of it, dingy.[1] He just wasn't independent like he normally is." Asked how long it was before that resolved and G was back to normal, Moyer stated that she perceived the "dinginess" to last about three months. She added that G "just wasn't the same" and that, "to some extent, he's still not the same."

The emergency room doctor was asked at trial whether G was diagnosed with a concussion. She testified that she did not believe that she diagnosed a concussion and that she did not know whether anyone else did. She explained that concussions are "on a spectrum" and that there is no "objective way of diagnosing a concussion acutely in the moment." Rather, a diagnosis is based on "a constellation of symptoms that happen after a head injury." The doctor did not describe the constellation of symptoms

---

[1] Like the parties, we understand Moyer to have used the slang term "dingy," *see Urban Dictionary*, https://www.urbandictionary.com/define.php?term=dingy (accessed May 19, 2023) ("Dingy is a word that can be used as an adjective to describe someone who is forgetful and makes silly choices at times. It's similar to ditzy, only usually implies it as a less intensified."), not the formal word that is spelled the same but pronounced differently, *see Webster's Third New Int'l Dictionary* 635 (unabridged ed 2002) (defining "dingy" to mean "dirty, soiled, discolored").

that would lead to a concussion diagnosis. However, when asked whether memory loss would be a symptom of a concussion, she responded that it "can be." Similarly, when asked if seeming "confused, out of it, and dingy" after an event would be consistent with a concussion, she responded that those things "could all be consistent with concussive symptoms."

Defendant moved for a judgment of acquittal at the close of the state's case, arguing that the evidence was legally insufficient to prove that G suffered "serious physical injury" or that a "deadly or dangerous weapon" was used. The trial court denied the motion. Defendant did not call any witnesses, so the court immediately proceeded to jury instructions, instructing the jury on first-degree assault and four lesser included offenses. The jury found defendant not guilty of first-degree assault, ORS 163.185(1)(a). It found him guilty of second-degree assault, ORS 163.175(1)(a). Given how the verdict form was written, the jury did not address the other three lesser included offenses.

## ANALYSIS

Defendant first assigns error to the denial of his motion for judgment of acquittal. We examine the evidence "in the light most favorable to the state to determine whether a rational trier of fact, accepting reasonable inferences and reasonable credibility choices, could have found the essential element of the crime beyond a reasonable doubt." *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995).

Second-degree assault under ORS 163.175(1)(a) requires "[i]ntentionally or knowingly caus[ing] serious physical injury to another[.]" Defendant contends that it was error to deny his motion for judgment of acquittal, because the evidence was legally insufficient to establish that G suffered "serious physical injury," which is defined in ORS 161.015(8) to mean "physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." *See* ORS 161.015 (stating that its definitions apply to "chapter

743, Oregon Laws 1971"); Or Laws 1971, ch 743, § 93 (enacting provision codified at ORS 163.175).

In arguing his motion for judgment of acquittal, defendant addressed each of G's injuries, explaining why they did not qualify as "serious physical injury." In response, the state argued that G suffered "serious physical injury" in the form of (1) a substantial risk of death from throat swelling related to his cheek injury; and (2) protracted impairment of health due to a concussion. The trial court denied defendant's motion without stating its reasons. The state then relied on the same two theories of "serious physical injury" in its closing argument to the jury. We address each in turn.[2]

With respect to G experiencing a substantial risk of death from throat swelling related to his cheek injury, we agree with defendant that the evidence was legally insufficient to support that theory of "serious physical injury." The emergency room doctor admitted G to the hospital in part so that medical care would be readily available if the swelling in the back of G's mouth progressed to the point of interfering with his breathing. It never progressed to that point, however, nor is there any evidence that it would have progressed to that point without medical intervention. Whether an injury creates a substantial risk of death is judged by the actual injury. *State v. Alvarez*, 240 Or App 167, 170-71, 246 P3d 26 (2010), *rev den*, 350 Or 408 (2011). Further, a possibility of a risk of death is not enough. *State v. Mayo*, 134 Or App 582, 586, 511 P2d 456 (1973). The evidence was insufficient to establish that G's actual cheek injury caused a "substantial risk of death."

We next consider whether the evidence was legally sufficient to prove protracted impairment of health due to a concussion. Below, defendant contested the sufficiency of

---

[2] In opposing the motion for judgment of acquittal, the state briefly made a third argument: that G's facial wounds created a substantial risk of death because they were "much worse" than the head injury described in *State v. Alvarez*, 240 Or App 167, 246 P3d 26 (2010), *rev den*, 350 Or 408 (2011). The trial court did not ask questions about that argument (as it did with the other two), the state did not make that argument to the jury, and the state does not make that argument on appeal. We therefore do not discuss it, except to note that we agree with defendant's arguments below as to why it fails.

the evidence to prove that G even had a concussion, but he no longer makes that argument on appeal, and we conclude that the evidence, albeit limited, was sufficient to allow a finding of concussion. The more difficult question is whether it was sufficient to prove that G's concussion caused a "protracted impairment of health."

We have not previously construed the phrase "protracted impairment of health" in the definition of "serious physical injury." Its meaning is ultimately a question of statutory construction, requiring us to look at text, context, and, if useful, legislative history. *State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009). We begin by considering the difference between "physical injury" and "serious physical injury"—a difference that often determines the degree of assault—particularly as to impairments.

"Physical injury" is a relatively low bar, requiring only "impairment of physical condition or substantial pain." ORS 161.015(7). In *State v. Higgins*, 165 Or App 442, 446, 998 P2d 222 (2000), we construed "impairment of physical condition" to mean any "harm to the body that results in a reduction in one's ability to use the body or a bodily organ":

> "[T]he legislature has not defined the phrase 'impairment of physical condition.' The dictionary definitions of these words prove helpful. Among other things, 'impairment' means 'the act of impairing or the state of being impaired,' *Webster's Third New Int'l Dictionary*, 1131 (unabridged ed 1993); 'physical' means 'of or relating to the body,' *id.* at 1706; 'condition' means 'the physical status of the body as a whole * * * or of one of its parts.' *Id.* at 473. The meaning of 'impairment' is clarified by the definition of 'impair,' which includes 'to make worse: diminish in quantity, value, excellence or strength: do harm to: damage, lessen.' *Id.* at 1131. This examination yields a construction that the legislature intended the phrase 'impairment of physical condition' to mean harm to the body that results in a reduction in one's ability to use the body or a bodily organ."

An "impairment of physical condition" need not last long to qualify as "physical injury." *Higgins*, 165 Or App at 446 ("a 'protracted' loss or impairment" is not required for "physical injury"); *e.g.*, *State v. Hendricks*, 273 Or App 1, 12, 359 P3d 294 (2015), *rev den*, 358 Or 794 (2016) (concluding that a jury

could find "impairment of a physical condition" where the victim could not breathe for five seconds while a pillow was forcibly held over her face).

We have repeatedly held that cuts and gashes qualify as "impairment of physical condition" because they disrupt the skin's function of protecting the inner body from infection. *E.g.*, *State v. Jones*, 229 Or App 734, 738-39, 212 P3d 1292, *rev den*, 347 Or 446 (2009) ("heavy scrape" about four inches long and one and one-half inches wide on the victim's back); *State v. Hart*, 222 Or App 285, 290-92, 193 P3d 42 (2008) (half-inch gash on the back of the victim's head). Physical injuries that make it difficult to engage in normal activities such as walking, using stairs, and lifting small objects also qualify as "impairment of physical condition." *State v. Glazier*, 253 Or App 109, 112-13, 288 P3d 1007 (2012), *rev den*, 353 Or 280 (2013). By contrast, minor scratches, scrapes, bruises, and the like that do not impede physical functioning are not an "impairment of physical condition." *E.g.*, *State v. Lewis*, 266 Or App 523, 527, 337 P3d 199 (2014) (some hair pulled out); *State v. Wright*, 253 Or App 401, 405-06, 290 P3d 824 (2012) (bruise on buttock); *Higgins*, 165 Or App at 447 (scratches and scrapes on neck and arm); *State v. Rice*, 48 Or App 115, 117-18, 616 P2d 538, *rev den*, 289 Or 741 (1980) (slight scratch on face).

With that understanding of "physical injury," we turn to "serious physical injury," which, again, is "physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ." ORS 161.015(8).

The difference between "physical injury" and "serious physical injury" is substantial, not slight. The 1970 commentary of the commission that drafted the definitions describes "serious physical injury" as synonymous with "serious bodily harm" and cites the Restatement of Torts for the proposition that "serious bodily harm" is harm that "'is so grave that it is regarded as differing in kind, and not merely in degree, from other bodily harm.'" Commentary to Criminal Law Revision Commission Proposed Oregon Criminal Code, Final Draft and Report §§ 3, 4 (July 1970)

(quoting *Restatement of Torts* § 63(b)); *see State v. Sparks*, 267 Or App 181, 199, 340 P3d 688 (2014), *rev den*, 357 Or 325 (2015) ("Regarding legislative history, the Criminal Law Revision Commission's official commentary to the Proposed Oregon Criminal Code, when relevant, is deemed particularly persuasive.").

The 1997 legislature also recognized the "'wide gap' between the categories of what constitutes a 'physical injury' and a 'serious physical injury'" when it created the interim category of "significant physical injury." *State v. Drew*, 302 Or App 232, 243, 460 P3d 1032 (2020), *rev den*, 368 Or 560 (2021) (quoting Tape Recording, House Committee on Judiciary, HB 2233, June 12, 1997, Tape 55, Side B (statements of Francis Baker of the Citizens Crime Commission)). The term "significant physical injury" appears in ORS 137.712 and affects sentencing. We have construed that term by looking to case law on "physical injury" and "serious physical injury," with the understanding that "significant physical injury" is meant to "fill in the gap." *Drew*, 302 Or App at 244.

This case concerns "protracted impairment of health" as a form of "serious physical injury."[3] In construing the meaning of that phrase, a question immediately arises whether "impairment of health," as used in the definition of serious physical injury, means something different from "impairment of physical condition," as used in the definition of physical injury. "Ordinarily, when the legislature uses different terms, we assume that the legislature intends those terms to have different meanings." *Norwood v. Premo*, 287 Or App 443, 451, 403 P3d 502, *rev den*, 362 Or 300 (2017). "That assumption is particularly warranted when, as here, the terms appear together in the same statutory scheme and

---

[3] We limit our analysis to "protracted impairment of health." In its answering brief on appeal, the state refers to impairment of "health and brain function" or "health or brain function." However, the state never mentioned G's "brain function" in the trial court, nor did the state argue that G suffered "protracted loss or impairment of the function of any bodily organ," which is another part of the definition of "serious physical injury" in ORS 161.015(8). Indeed, the trial court expressly noted during argument on defendant's motion that the state was *not* arguing impairment of bodily function, only impairment of health. In any event, the state has not developed any argument regarding impairment of brain function as distinct from impairment of health.

give rise to different legal consequences." *Id*. As commonly used, "health" appears to be a somewhat broader term than "physical condition," while also overlapping to some extent with vital bodily "functions":

> "**1 a :** the condition of an organism or one of its parts in which it performs its vital functions normally or properly **:** the state of being sound in body or mind * * * **b :** the condition of an organism with respect to the performance of its vital functions."

*Webster's* at 1043 (unabridged ed 2002) (boldface in original).

No existing Oregon case law addresses whether or when a concussion qualifies as "impairment of health" and thus "serious physical injury" for purposes of ORS 161.015(8).[4] Defendant argues that the legislature did not intend a concussion to qualify, particularly one that caused only some quietness and "dingy" behavior. The state maintains that the testimony was sufficient to establish that G had a concussion that caused "impairment of health."

Based on our foregoing analysis, we conclude that a physical injury that results in a concussion *may* cause "impairment of health." Whether it did so in a particular case will depend on the evidence. Here, assuming that G had a concussion, the evidence was quite minimal as to what symptoms were likely caused by that concussion, as opposed to pain from physical injuries, emotional distress about the situation, or the like. G perceived a "lack of cognizance" and was told that he "kind of quit taking care of the house and one thing and another." Moyer observed confusion, quietness, and G being "out of it" or "dingy," which then "sort of turned into depression." The only evidence meaningfully linking that testimony to the effects of a concussion

---

[4] In *State v. Scatamacchia*, 323 Or App 31, 32-34, 522 P3d 26 (2022), *rev den*, 370 Or 827 (2023), the defendant repeatedly punched a woman in the eye, causing a "blow-out" orbital fracture and a concussion, which was found to be "serious physical injury" at trial, but the only issue on appeal was an instructional error related to mental state. In *State v. Tyler*, 239 Or App 401, 403, 245 P3d 168 (2010), the defendant was convicted of *attempted* second-degree assault for *attempting* to cause serious physical injury by punching a woman repeatedly in the head, arms, neck, and face, which in fact caused her to suffer "a concussion and severe, prolonged pain," but attempt is obviously different, and the only issue on appeal related to merger.

was the emergency room doctor's testimony that confusion, quietness, and being "out of it" or "dingy" are things that "can" or "could" be concussive symptoms.

Assuming without deciding that the foregoing evidence was enough to establish that G had a concussion that caused some "impairment of health," the next question is whether the evidence was sufficient to establish that the impairment of health was "protracted," which is also necessary for "serious physical injury." As noted above, G perceived the concussion to resolve within six weeks, while Moyer thought that G's "concussive symptoms" lasted for about three months, particularly the "dinginess." Viewed in the light most favorable to the state, that evidence establishes that G showed *some* concussive symptoms for as long as three months.[5]

The parties have not cited, and we have not found, any prior Oregon case holding that three months is a "protracted" period under ORS 161.015(8). We have held that disfigurement is "protracted" when it is still present after five or six months. *State v. Kinsey*, 293 Or App 208, 214, 426 P3d 674 (2018) (six months); *Alvarez*, 240 Or App at 171 (five months). Beyond that, there is little guidance. The common meaning of "protracted" provides no practical assistance. *See Webster's* at 1826 (defining "protract," as used here, to mean "to draw out or lengthen in time or space : CONTINUE : PROLONG").

What does shed some light is that "significant physical injury" is defined to include "a *prolonged* impairment of health or the function of any bodily organ." ORS 137.712 (6)(c)(D) (emphasis added). "Prolonged" and "protracted" are synonymous in common meaning. *See Webster's* at 1815

---

[5] The state briefly suggests that the evidence would allow a finding that G still had concussive symptoms at the time of trial (10 months after the incident), presumably based on G's testimony that he was still in "kind of a depressed mode" and Moyer's testimony that G was "to some extent *** still not the same." We reject that suggestion, given the vagueness of the testimony and the lack of any medical evidence of how long concussive symptoms can last. A jury could reasonably infer that G had concussive symptoms for three months; anything beyond that would not be a reasonable inference on this record. *See State v. Bivins*, 191 Or App 460, 467-69, 83 P3d 379 (2004) (jurors are permitted to make "reasonable inferences" from evidence, including relying on common experience, but are not allowed to engage in "speculation and guesswork").

(defining "prolong," as used here, to mean "to lengthen in time : extend in duration : draw out : CONTINUE, PROTRACT"). However, given the legislative history and overall statutory scheme, it is clear that the legislature intended "prolonged" in this context to mean a time period longer than "temporary" but shorter than "protracted." The term "significant physical injury" is meant to identify a subset of injuries that are on the more serious end of "physical injury" but that do not qualify as "serious physical injury." *Drew*, 302 Or App at 243. Each subpart of the definition of "significant physical injury" is carefully drafted to require *less* than "serious physical injury" requires, in part by distinguishing between "temporary," "prolonged," and "protracted" disfigurements and impairments. *Compare* ORS 161.015(8) (defining "serious physical injury" as physical injury that creates "a substantial risk of death" or "causes serious and protracted disfigurement, protracted impairment of health[,] or protracted loss or impairment of the function of any bodily organ"), *with* ORS 137.712(6)(c) (defining "significant physical injury" as an injury that "[c]reates a risk of death that is not a remote risk" or "[c]auses a serious and temporary disfigurement," "a protracted disfigurement," or "a prolonged impairment of health or the function of any bodily organ"). The statutory scheme as a whole thus contemplates three possible durations of impairment or disfigurement: temporary, prolonged, and protracted.

Ultimately, we conclude that the trial evidence was legally insufficient to prove that G suffered a concussion that caused "protracted impairment of health" as the legislature intended that phrase for purposes of "serious physical injury" in ORS 161.015(8). The evidence would allow a finding that G had *some* concussive symptoms for up to three months, but there is no evidence as to the frequency or severity of those symptoms—particularly after the first six weeks when G himself felt that his concussion had resolved—or the degree to which they impaired G's "health."

For example, the symptoms could have been pronounced for a few weeks and then gradually diminished to the point that G perceived no symptoms at six weeks and Moyer perceived no symptoms at three months. *Cf. State v. Dillon*, 24 Or App 695, 698-99, 546 P2d 1090 (1976) (concluding that

the evidence was insufficient to establish that a bullet lodged in the victim's soft tissue constituted "serious physical injury," where the medical evidence was inadequate, and the victim "really c[ould]n't say" at trial whether it presently bothered him). Without any evidence of the frequency or severity of symptoms that G and Moyer attributed to a concussion, or how they changed over time, it is impossible to know how long G's "health" was impaired—unless one considers any observation of any symptom (including symptoms that the victim himself cannot detect) enough to establish an ongoing "impairment of health," which we view as inconsistent with the legislative intent regarding "serious physical injury." On this record, the evidence was legally insufficient to establish "protracted impairment of health."

Accordingly, the trial court should have granted defendant's motion for judgment of acquittal as to second-degree assault under ORS 163.175(1)(a).[6] There is no question that G suffered "serious" injuries in the lay sense, and our holding is in no way meant to downplay those injuries or what happened to G. Legally, however, the evidence was insufficient to meet the statutory definition of "serious physical injury" in ORS 161.015(8). The state implicitly recognizes that G's external facial wounds, while looking terrible, did not meet the legal definition of "serious physical injury." And, for the reasons explained, the swelling in G's mouth and the evidence of concussion also do not meet the statutory definition of "serious physical injury."

The next question is the proper remedy. Neither party addresses that issue, beyond defendant asking us to "reverse" his conviction, and the state asking us to reject defendant's first assignment of error.

We conclude that the proper remedy is to reverse defendant's conviction for second-degree assault under ORS 163.175(1)(a) and remand for further proceedings, which may

---

[6] Technically, defendant moved for judgment of acquittal only on the indicted charge of first-degree assault, ORS 163.185(1)(a), challenging the sufficiency of the evidence as to the "deadly or dangerous weapon" and "serious physical injury" elements. However, his "serious physical injury" argument would apply equally to the lesser included offense of second-degree assault under ORS 163.175(1)(a), and both parties agree on appeal that the issue is also preserved as to second-degree assault, as do we.

include a new trial on lesser included offenses that do not require "serious physical injury." Recall that defendant was indicted for first-degree assault. The jury was instructed on that offense and four lesser included offenses: second-degree assault on a nonweapons theory, second-degree assault on a weapons theory, third-degree assault, and fourth-degree assault. The jury ultimately rendered a verdict only on first-degree assault (not guilty) and the nonweapons theory of second-degree assault (guilty). It did not address the other lesser-included theories, nor do its findings foreclose those other theories.[7] Having concluded that the nonweapons theory of second-degree assault should not have gone to the jury, the proper disposition is to put the parties back in the position where they would have been if defendant's motion had been granted.

In other circumstances, we could simply remand for entry of a conviction for fourth-degree assault, ORS 163.160(1)(a), which is committed when a person "[i]ntentionally, knowingly or recklessly causes physical injury to another." The jury necessarily found that defendant at least "knowingly" caused "physical injury" to G. *Cf. State v. Moyer*, 37 Or App 477, 481, 587 P2d 1054 (1978) (modifying judgment from first-degree assault to second-degree assault, where the evidence was insufficient to establish "serious physical injury," but "physical injury" and use of a deadly weapon had been established); *Dillon*, 24 Or App at 699 (reversing conviction for first-degree assault, where the evidence was insufficient to prove "serious physical injury" in the form of "protracted impairment of health," and remanding for entry of a conviction for second-degree assault, because the jury necessarily found "physical injury" in the form of "impairment of physical condition or substantial pain," which was supported).

Here, however, if the trial court had granted defendant's motion for judgment of acquittal as to first-degree

_____

[7] A person commits first-degree assault under ORS 163.185(1)(a) if a person "[i]ntentionally causes serious physical injury to another by means of a deadly or dangerous weapon[.]" We cannot tell from the verdict form whether the jury found defendant not guilty of first-degree assault because it was unpersuaded that he acted *intentionally*, because it was unpersuaded that he used a weapon, or both.

assault and the nonweapons theory of second-degree assault, it is virtually certain on this record that the state would have continued to pursue lesser included offenses that do not require "serious physical injury," including, at a minimum, the weapons theory of second-degree assault. *See* ORS 163.175(1)(b) ("A person commits the crime of assault in the second degree if the person * * * [i]ntentionally or knowingly causes physical injury to another by means of a deadly or dangerous weapon[.]"). There is also the complication that the jury was not instructed on the mental-state requirement for the physical-injury element of assault, which might also affect our decision whether to direct entry of a conviction for fourth-degree assault.

Given the particular procedural posture of this case, we therefore reverse defendant's conviction for second-degree assault under ORS 163.175(1)(a) and remand for further proceedings. *Cf. State v. Raygosa*, 320 Or App 77, 83-84, 512 P3d 824, *rev den*, 370 Or 455 (2022) ("To put the parties in the position they would have been in had the court not plainly erred in allowing the state to proceed on the sexual abuse charges on Counts 11 and 12, we reverse defendant's convictions on those counts and remand for retrial on a legally correct lesser-included offense."); *State v. Burgess*, 240 Or App 641, 649, 251 P3d 765 (2011), *aff'd*, 352 Or 499, 287 P3d 1093 (2012) (crafting an appropriate remedy where neither outright reversal nor entry of conviction on a lesser included offense was appropriate "given the idiosyncratic procedural posture" of the case).

Our resolution of defendant's first assignment of error obviates the need to address defendant's second assignment of error.[8]

Reversed and remanded.

---

[8] In his second assignment of error, defendant argues that it was plain error not to instruct the jury on the mental-state requirement for the physical-injury element of assault, relying on the Supreme Court's recent decision in *Owen*, 369 Or at 317. We have already reversed defendant's conviction, so the only point in addressing the instructional error would be if it was likely to arise on remand in the same posture. Here, it almost certainly will not, because *Owen* was decided after defendant's trial, and the parties will presumably request the instruction required by *Owen* in the event of a retrial.